In re Holice Toler JACKSON, Jr., Debtor.

Linda K. Sharkey JACKSON, Plaintiff,

v.

Holice Toler JACKSON, Jr., Defendant.

Bankruptcy No. 87–00083.
Adv. No. 87–0062.

United States Bankruptcy Court,
M.D. Louisiana.

June 30, 1989.

---

Michael O. Hesse of St. Francisville, La., for plaintiff, Linda K. Sharkey Jackson.

Charles N. Malone of Baton Rouge, La., for defendant, Holice Toler Jackson, Jr.

## REASONS FOR DECISION

LOUIS M. PHILLIPS, Bankruptcy Judge.

On January 21, 1987, the Defendant, Holice Toler Jackson, Jr., filed for relief under Chapter 7 of the Bankruptcy Code. The Plaintiff, Linda K. Sharkey Jackson, brought this timely complaint against the Debtor alleging that Mr. Jackson was indebted to her for past due alimony and child support payments and requesting that this Court determine that the past-due payments should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(5).[1] After trial of this proceeding and the submission of certain post-trial statements, the matter was taken under advisement.

1. The original complaint contained further allegations that the Debtor hid certain assets from the Plaintiff in connection with the community property settlement, that the Debtor hid assets from creditors and, therefore, should be denied a discharge under 11 U.S.C. § 727. However, after further discovery into the § 727 allegation and after a determination that the community property equity interest was virtually without value, Plaintiff chose not to pursue the § 727 allegations.

*Jurisdiction of the Court*

This is a proceeding arising under Title 11 U.S.C. The United States District Court for the Middle District of Louisiana has original jurisdiction pursuant to 28 U.S.C. § 1334(b). By Local Rule 29, under the authority of 28 U.S.C. § 157(a), the United States District Court for the Middle District of Louisiana referred all such cases to the Bankruptcy Judge for the district and ordered the Bankruptcy Judge to exercise all authority permitted by 28 U.S.C. § 157.

This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I); pursuant to 28 U.S.C. § 157(b)(1), the Bankruptcy Judge for this district may hear and determine all core proceedings arising in a case under Title 11 referred under 28 U.S.C. § 157(a), and the Bankruptcy Judge may enter appropriate orders and judgments.[2]

A motion for discretionary abstention pursuant to 28 U.S.C. § 1334(c)(1) was incorporated into the answer filed by the defendant. By minute entry dated August 17, 1987, the Honorable John V. Parker, U.S. District Court, denied the request for abstention (upon the recommendations forwarded from the bankruptcy court). No party filed a timely motion for mandatory abstention under 28 U.S.C. § 1334(c)(2). No party has filed a motion under 28 U.S.C. § 157(d) to withdraw all or part of the case or any proceeding thereunder, and the District Court has not done so on its own motion.

*Background*

In March of 1983 Mrs. Jackson filed a petition for separation in Louisiana state court (the 20th District Court for the Parish of East Feliciana). Mr. Jackson responded with an answer and reconventional demand (the Louisiana procedural equiva-

2. The defendant, by answer, objected to the exercise of jurisdiction by the Bankruptcy Judge. This Court (Honorable Wesley W. Steen, presiding), by an Order Following Scheduling Conference dated July 9, 1987, ruled that this proceeding was core and that the Court's jurisdiction therefore extended to the issuance of a final order.

lent of a counterclaim) seeking separation. After issues were joined in the separation action, the parties and their attorneys reached an agreement which was reduced to writing (drafted by Mr. Jackson's attorney, William G. Carmichael) and submitted to the state court in the form of a judgment granting separation. The judgment was rendered in the chambers of the Honorable William F. Kline, Jr. on May 6, 1983, and was signed in open court on June 7, 1983.

The judgment granted Mr. and Mrs. Jackson a separation from bed and board on the grounds of mutual fault and ordered joint custody of the three minor children. It also provided for Mr. Jackson to pay Mrs. Jackson $400 per month and to convey to Mrs. Jackson his interest in three community automobiles as support for the children of the marriage. The separation judgment further provided that the parties would enter into a community property partition agreement whereby Mr. Jackson would convey to Mrs. Jackson his interest in the community residence and "pay to Linda Kay Sharkey Jackson, as part of the community property partition agreement, the sum of SIX HUNDRED AND NO/100 DOLLARS ($600.00) per month, said payments to be terminated only if Linda Kay Sharkey Jackson dies or remarries." Additionally, Mrs. Jackson was required to convey to Mr. Jackson all other community property, reserving twenty-five percent of the minerals in a one hundred acre tract of land, and Mr. Jackson was required to assume liability for all existing community debts.[3] The parties informed the court that they had reached a voluntary agreement evidenced by the consent judgment.

Subsequently, the parties executed a community property partition agreement, which was recorded in the records of the Clerk of Court for East Feliciana Parish, Louisiana, on August 16, 1983. Under the terms of the community property agreement, Mrs. Jackson transferred to her ex-husband approximately 100 acres of unim-

proved immovable property in East Feliciana Parish, two lots in Wildwood Subdivision in East Feliciana Parish, the community's interest in Hill Country Realty, Inc., a 1980 Dodge pick-up truck, and a Massey–Ferguson tractor. Mrs. Jackson acquired the community home in Clinton, Louisiana, free of mortgage, and the furniture, fixtures and appliances located in the home. Mr. Jackson assumed all of the obligations of the community. The partition agreement also included the provision that, in consideration of the transfer of property to Mr. Jackson, "Holice T. Jackson agrees to pay Linda Kay Sharkey Jackson the sum of Six Hundred and No/100 Dollars (600.00) per month until her remarriage or for the remainder of her life if she remains unmarried."

Mrs. Jackson brought to trial the two-fold allegation that: (i) since Mr. Jackson did not pay the $400.00 monthly child support payment in accordance with the state court judgment there were pre-petition child support arrearages that should be excepted from discharge under § 523(a)(5); and (ii) since the $600.00 a month payment obligation was actually in the nature of alimony, maintenance or support, the arrearages in this obligation are likewise non-dischargeable pursuant to § 523(a)(5). Mr. Jackson argues that the child support obligation was fully paid, or alternatively that any reductions in the $400.00 payment were authorized under state law, and that the $600.00 payment obligation is a dischargeable obligation in the nature of a property settlement debt.

The plaintiff requests that this Court fix the extent of the child support and alimony arrearages as opposed to requesting solely that the Court issue a ruling on whether the obligations are dischargeable. Likewise, Mr. Jackson advises through post-trial memorandum that this Court possesses the authority (upon the legal authority presented in the memorandum) to deter-

---

**3.** The judgment also contained other miscellaneous provisions which are not directly relevant to the disposition of this case. For example, it provided that Mr. Jackson maintain health insurance on Mrs. Jackson until the judgment of divorce was rendered and that Mr. Jackson pay all medical and dental expenses of the minor children.

mine that the child support obligation has been satisfied under state law.[4]

This Court is presented with two issues in this proceeding: (i) whether the six hundred dollar per month obligation is in the nature of alimony, maintenance or support, and thereby nondischargeable pursuant to the provisions of 11 U.S.C. § 523(a)(5) (and, if so, the extent of the liability); and (ii) whether Mr. Jackson fully satisfied the four hundred dollar child support payment described in the Judgment of Separation prior to the bankruptcy petition date or owed back child support payments that would likewise be nondischargeable under 11 U.S.C. § 523(a)(5) (and if so the extent of the liability).

Regarding the issue of the extent of liability, the parties have stipulated that *all* payments due by Mr. Jackson to Mrs. Jackson were current through January of 1984. However, from February of 1984 through the filing of the bankruptcy petition in January, 1987, Mr. Jackson paid a reduced monthly amount to Mrs. Jackson. The parties stipulated that the following amounts were paid, beginning in February, 1984:

|        | 1984    | 1985    | 1986    | 1987    |
|--------|---------|---------|---------|---------|
| Jan.   |         | $868.49 | $484.73 | $484.73 |
| Feb.   | $866.00 | 484.73  | 484.73  |         |
| March  | 866.00  | 869.73  | 484.73  |         |
| April  | 867.00  | 867.73  | 484.73  |         |
| May    | 867.00  | 867.73  | 484.73  |         |
| June   | 867.00  | 867.73  | 484.73  |         |
| July   | 867.00  | 484.73  | 484.73  |         |
| Aug.   | 867.00  | 733.73  | 484.73  |         |
| Sept.  | 868.49  | 484.73  | 484.73  |         |
| Oct.   | 867.73  | 484.73  | 484.73  |         |
| Nov.   | 867.73  | 484.73  | 484.73  |         |
| Dec.   | 867.73  | 484.73  | 484.73  |         |

Thus, at the time the bankruptcy petition was filed, Mr. Jackson had paid $12,176.31 less than required by the specific terms of the Separation Agreement.[5] The payment schedule provides the parties with several alternative positions, which have not been fully threshed out but can be discerned. From Mr. Jackson's perspective, if the $600.00 obligation is dischargeable, then the monthly payment went first toward the child support obligation (whether or not it was reduced, in order to pay it in full) and then to the $600.00 obligation to Mrs. Jackson. If the $600.00 obligation is not dischargeable, Mr. Jackson is very interested in this Court finding that the child support obligation was reduced, so that there is a greater percentage of each monthly payment to be allocated to the $600.00 obligation. If the support payment is found to be dischargeable, Mrs. Jackson would prefer this Court to at least prorate the payments so that some child support liability remains.[6] If the child support obligation was not reduced *and* the $600.00 is nondischargeable, there is no need to be concerned with allocation, since the full $12,176.31 is nondischargeable (less any reduction due to the receipt of $2,013.87 from the estate).

### Discussion

As mentioned, the $600 obligation is first mentioned in the Separation Judgment, which orders Mr. Jackson, "as part of the community *property partition agreement*" to pay the $600.00 as long as Mrs. Jackson lives or until she remarries; and is then referred to in the Community Property Partition.

Mrs. Jackson asserts that the $600.00 payment was in the nature of support and is thereby nondischargeable. Counsel ar-

---

**4.** Counsel for Mr. Jackson has briefed the issue of whether there are pre-petition child support arrearages. The discussion is set forth below, wherein the Court clearly assumes jurisdiction to fix the pre-petition amount of support arrearages, upon the authority cited by both parties and the evidence adduced at trial (introduced through documents and witnesses submitted and questioned by both parties.)

**5.**
| | |
|---|---|
| Total amount due under the agreement for the period 2/84 through 1/87 ($1,000 per month): | $36,000.00 |
| LESS Total amount paid for the period 2/84 through 1/87: | $23,823.69 |
| | $12,176.31 |

**6.** As an aside, the Court notes that Mrs. Jackson has received a distribution from the estate in the amount of $2,013.87 on account of her proof of claim. Both parties have suggested that in the event any child support is due pre-petition, the sum should be imputed toward reduction thereof.

gues that Mrs. Jackson intended for the payment to be alimony; that the term of the obligation (for the rest of her life or until she remarries) was the equivalent of the term of the normal alimony judgment under state law; that Mr. Jackson initially offered $1,000.00 child support; that she was in need of support at the time of the judgment of separation; and that she and her husband treated the payments like alimony for tax purposes.

Mr. Jackson contends that the agreement which was reduced to the Separation Judgment clearly delineates the support obligation of Mr. Jackson ($400.00 per month, transfer of three automobiles and provision of income) and the community property division (transfer of property, the $600.00 payment). He argues that the documents and Court judgment clearly establish that the $600.00 obligation is in the nature of a property settlement. Counsel argues that Mr. Jackson was adamant in his refusal to pay alimony on the basis of his belief that his wife was at least equally at fault in causing the separation and divorce. Further, counsel for Mr. Jackson argues that the separation was *actually* granted on the grounds of mutual fault and, therefore, as Louisiana law prohibits a party from establishing a right to alimony if mutual fault is found, the obligation cannot have been in the nature of alimony or support. Finally, counsel argues that the present value of the $600.00 payment (assuming a normal lifespan for Mrs. Jackson) approximates the value of the property interests transferred by Mrs. Jackson to Mr. Jackson and therefore should be deemed consideration for such transfer.

### The $600 Payment

Generally, a discharge under § 727 of the Bankruptcy Code discharges a debtor from all debts that arose prior to the date of the order for relief. However, § 523 of the Code provides exceptions to the general discharge and the debtor's "fresh start." The pivotal provision is § 523(a)(5) which excepts from a discharge a debt:

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with state or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

(A) such debt is assigned to another entity, voluntarily, by operation of law, or otherwise (other than debts assigned pursuant to section 402(a)(26) of the Social Security Act, or any such debt which has been assigned to the Federal Government or to a State or any political subdivision of such State); or

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support; ...

The legislative history accompanying this provision makes it clear that what constitutes alimony, maintenance, or support, or rather whether a liability is actually in the nature of alimony, maintenance or support will be determined under bankruptcy law as opposed to state law. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 363 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 77–79 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5862–5864, 5963, 6318. The provision departs from the general fresh start policy of the Code and "enforces an overriding public policy favoring enforcement of familial obligations." [7] Thus, as the analysis of the Court is one under federal law, the bankruptcy court is charged with the duty to determine the true nature and substance of an obligation within the context of 11 U.S.C. § 523(a)(5), "regardless of the characterization placed on it by the parties' agreement or the state court proceeding." *In re Benich*, 811 F.2d 943, 945 (5th Cir.1987) (footnotes omitted).

In cases such as this one where the court decree is in fact an order approving an agreement between the parties (without tri-

7. *Shaver v. Shaver*, 736 F.2d 1314, 1315–16 (9th Cir., 1984).

al of issues), the "Court must look beyond the language of the decree to the intent of the parties and to the substance of the obligation." *Shaver v. Shaver*, 736 F.2d 1314, 1316 (9th Cir., 1984) (decision by The Honorable John M. Wisdom, sitting by designation); *In re Benich, supra* at 945; (the court may, therefore, consider extrinsic evidence to determine the real nature of the underlying obligation in order to determine its dischargeability); *In re Goin*, 808 F.2d 1391 (10th Cir., 1987); *In re Williams*, 703 F.2d 1055 (8th Cir.1983).[8] See also *Erspan v. Badgett*, 647 F.2d 550, 555 (5th Cir., 1981), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982) ("regardless of how a state may choose to define 'alimony', a federal court, for purposes of applying the federal bankruptcy laws, is not bound to a label that a state affixes to an award, and that, consistent with the objectives of federal bankruptcy policy, the substance of the award must govern.").

■ Counsel for Mr. Jackson cites *In re Hudgens*, 57 B.R. 184 (Bankr.M.D.La., 1986) for the proposition that unless the agreement *expressly* designates that an obligation is in the nature of alimony or support, the debt is automatically dischargea-

ble. In *Hudgens* the court stated that "[i]t appears that § 523(a)(5) would require that the payment be designated and agreed by the parties to be alimony." *Id.* at 186. Although this language, taken out of context, seems to support the defendant's position, it is clear to this Court, upon reading the full text of the opinion and the cases cited therein, that the court did not intend to require that the payment be labeled alimony for it to fall within the § 523(a)(5) exception from discharge. The court was merely restating the requirement of § 523(a)(5)(B) that *if* the payment is designated as alimony, then that designation, alone, is not sufficient. The parties must also have intended (or agreed) that the obligation was alimony (or in the nature of alimony or support). Hence, the court was required to ascertain the intent of the parties.[9] This Court's reading of *Hudgens*, then, requires the conclusion that *Hudgens* is, in fact, in line with the directives of *Benich, supra; Shaver, supra; Goin, supra, etc.*, that this Court inquire into the intent of the parties through analysis of the agreement and extrinsic evidence.

In essence, then, the bankruptcy and federal courts which have spoken to the ques-

---

**8.** The language of the agreement is considered by the majority of the courts to be but a factor to consider. However, certain courts have suggested, by implication, that ambiguity is required before extrinsic evidence should be received to establish the nature of the obligation. "A written agreement between the parties is persuasive evidence of intent. *Tilley v. Jessee*, 789 F.2d 1074, 1077 (4th Cir., 1986). Thus, if the agreement clearly shows that the parties intended the debt to reflect either support or a property settlement, then that characterization will normally control. On the other hand, if the agreement is ambiguous, the court must determine the parties' intentions by looking to extrinsic evidence." *In re Yeates*, 807 F.2d 874, 878 (10th Cir., 1986). This Court does not have to decide whether as a matter of law extrinsic evidence is only to be received where the agreement is ambiguous. The agreement at issue contains ambiguity sufficient to allow the introduction of extrinsic evidence of intent, even if this Court should follow the inference derived from *In re Yeates, supra*. As mentioned, the payment of $600.00 was to be made to Mrs. Jackson "until her remarriage or for the remainder of her life if she remains unmarried." This payment term is essentially the term of permanent alimony under state law where ali-

mony is granted in the form of periodic payments (Civil Code Article 160(A)(4). The Court notes that there is inherent tension in the authority to look beyond the plain language of a separation judgment or community property agreement. However, there is no prohibition on such if the agreement or judgment is but a factor (or one item of evidence) to consider, and since there is ambiguity here, this inherent tension is experienced only in the abstract.

**9.** In *Hudgens*, the debtor and his ex-wife executed a community property partition agreement which, in addition to dividing up certain assets, provided that the debtor would pay (among other things) the balance of a community debt secured by a second mortgage on his former wife's home. The agreement also included a provision that the wife would not seek alimony *pendente lite*. In rejecting the wife's contention that the obligation to pay the second mortgage note constituted non-dischargeable alimony, the court stated that if a specific value could be allocated to the agreement not to seek alimony, then arguably that value would be non-dischargeable. Without such an allocation, the court found nothing that suggested that the obligations under the partition agreement were intended to be in the nature of support.

tion of how to determine whether an obligation is actually one in the nature of alimony, maintenance, or support for purposes of § 523(a)(5) have found themselves engaged in fashioning a federal law which, for bankruptcy purposes, may well preempt state law, given the preeminent directives and policies of the Bankruptcy Code. Such an endeavor should, however, interfere as little as possible with the overriding state interest in promulgating and overseeing the law of domestic relations within a state's boundaries.

In attempting to arrive at the intent of the parties, the courts have enumerated various factors to be considered in connection with domestic agreements or judgments. *See e.g. In re Nelson,* 16 B.R. 658, 660–61 (Bankr.M.D.Tenn.1981), *rev'd in part on other grounds,* 20 B.R. 1008 (1982) (identifying eleven factors); in *In re Coffman,* 52 B.R. 667, 674–75 (Bankr.D. Md.1985) (identifying eighteen factors).[10] These lists of factors, however, should not be used as a checklist of considerations that need to be proven or even considered in every case. In examining the support-type considerations that a court may take into account, the Fifth Circuit has explained that such considerations "are not legal criteria, ... but relevant evidentiary factors that assist the bankruptcy court as trier of fact in determining the true nature of the debt created by the agreement." *Benich,* 811 F.2d at 945. Thus, the factors described in such lists should not lead the Court to undertake mathematical calculations as to the percentage of factors present in a given factual situation, but should serve as a non-exhaustive list of considerations that, if present, help divine the intent of the parties.[11]

In *Benich, supra,* the former spouses entered into a property settlement agreement that required Mr. Benich to pay his ex-wife $725 a month for three months and $400 a month for the rest of her life or until she remarried. When Mr. Benich failed to make the payments, Mrs. Benich filed suit against him in state court and recovered a lump sum judgment of $56,100. After Mr. Benich filed bankruptcy, his ex-wife sought to have the judgment declared nondischargeable. The court recognized

---

**10.** Judge Mannes in *Coffman* surveyed the applicable case law and compiled a list of eighteen factors to be used in distinguishing between a support award and a property division:

1. Whether there was an alimony award entered by the state court.
2. Whether there was a need for support at the time of the decree; whether the support award would have been inadequate absent the obligation in question.
3. The intention of the court to provide support.
4. Whether debtor's obligation terminates upon death or remarriage of the spouse or a certain age of the children or any other contingency such as a change in circumstances.
5. The age, health, work skills, and educational levels of the parties.
6. Whether the payments are made periodically over an extended period or in a lump sum.
7. The existence of a legal or moral "obligation" to pay alimony or support.
8. The express terms of the debt characterization under state law.
9. Whether the obligation is enforceable by contempt.
10. The duration of the marriage.
11. The financial resources of each spouse, including income from employment or elsewhere.
12. Whether the payment was fashioned in order to balance disparate incomes of the parties.
13. Whether the creditor spouse relinquished rights of support in payment of the obligation in question.
14. Whether there were minor children in the care of the creditor spouse.
15. The standard of living of the parties during their marriage.
16. The circumstances contributing to the estrangement of the parties.
17. Whether the debt is for a past or future obligation, any property division, or any allocation of debt between the parties.
18. Tax treatment of the payment by the debtor spouse.

In a footnote to the opinion, Judge Mannes cites the cases from which he derived the list of factors, and following each cite, notes the corresponding factors considered.

**11.** While the "factors tests" are helpful in their elucidation of relevant considerations, this Court declines to adopt the proposition that it is bound to apply any particular factor test to the issues raised in this proceeding (as sort of a checklist). This Court reserves the discretion to attribute varying weights and emphasis to certain considerations and to look to state law for non-dispositive guidance.

that the intention of the parties when they executed the agreement was the ultimate question. However, despite Mr. Benich's uncontradicted testimony that he never intended to pay alimony or support, the trial court found that the language of the agreement and the actual situation of the parties at the time when the agreement was made was more determinative of the intention of the parties.[12] The Fifth Circuit found no error in the trial court's weighing of the evidence and affirmed the lower court decision that the lump sum payment was an obligation in the nature of support and therefore nondischargeable.

██ The Ninth Circuit has addressed the § 523(a)(5) dischargeability issue in a case involving facts similar to the present case. In *Shaver v. Shaver, supra,* the Indiana state court entered a judgment requiring Mr. Shaver to pay his ex-wife $197,300 over a ten-year period in settlement of her "property rights." The judgment also provided that the payments would cease if Mrs. Shaver died within the ten-year period. The court found that four factors militated in favor of characterizing the debt as one in the nature of support:

(1) if the agreement fails to provide explicitly for spousal support, the court may presume that the property settlement is intended for support if it appears under the circumstances that the spouse needs support; (2) when there are minor children and an imbalance of income, the payments are likely to be in the nature of support; (3) support or maintenance is indicated when the payments are made directly to the recipient and are paid in installments over a substantial period of time; and (4) an obligation that terminates on remarriage or death is indicative of an agreement for support.

*In re Goin,* 808 F.2d 1391, 1392–93 (10th Cir.1987) citing *Shaver v. Shaver,* 736 F.2d at 1316.[13] In affirming the lower court,

---

**12.** The trial court found that "[t]here was no evidence of fault on the part of either spouse or of Mrs. Benich's inability to work ..." 811 F.2d at 945. According to Mr. Benich's uncontradicted testimony, Mrs. Benich was well educated. However, "she had not worked during the long marriage, was not shown to have any occupational training, and had unsuccessfully sought to obtain work during her marriage." *Id.* The trial court was also persuaded by the fact that Mrs. Benich gave up her rights to her ex-husband's future military retirement benefits in exchange for his agreement to provide "support" payments (and noted that had she retained her rights in the retirement after divorce, the bankruptcy would not have affected her interest therein).

**13.** This Court's agreement with the approach of *Benich* and *Shaver, supra,* places it in conflict with the appellate authority out of the Sixth Circuit (*Long v. Calhoun,* 715 F.2d 1103 (6th Cir.1983) and *Singer v. Singer,* 787 F.2d 1033 (6th Cir.1988)) regarding the applicability of certain considerations. The *Calhoun* and *Singer* courts, in addition to determining intent of the parties, require the trial court to inquire whether the amount of support is unreasonable and, if unreasonable, what portion (the reasonable portion) should be deemed nondischargeable under § 523(a)(5). This analysis requires the bankruptcy court to investigate the present needs of the respective spouses, whether there have been changes in circumstances so as to allow for a lower support obligation, and in fact to sit as a surrogate state family court to monitor the substantive propriety of state court awards. *See In*

*re Caughenbaugh,* 92 B.R. 255 (Bankr.S.D.Ohio 1988) wherein the bankruptcy court, following *Calhoun,* ruled that the amount of support originally granted by the separation judgment was not "manifestly erroneous and unreasonable under traditional concepts of support", at 257, citing *Calhoun, supra,* but reduced the post-bankruptcy obligation after what looks like a full-blown state court alimony trial.

As mentioned above, bankruptcy courts are, in fact, charged with the duty of fashioning a federal law regarding whether an obligation is actually in the nature of alimony, support and maintenance, but the scope of this duty is narrow, limited to just what is necessary to accomodate preemptive federal policy. The *Calhoun* and *Singer* analysis focuses upon the federal interest in the debtor's fresh start provided by the discharge, while this Court's focus is primarily on the expressed federal policy of a favoring the continuing enforceability of familial obligations (those *actually* in the nature of alimony, maintenance or support). This more limited analysis is "grounded in the long-standing policy of confining the whole subject of domestic relations to the state courts of domicile of husband and wife." *In re Stone,* 79 B.R. 633, at 640 (Bankr.D.Mo.1987); *Forsdick v. Turgeon,* 812 F.2d 801 (2nd Cir.1987). *See e.g., Rose v. Rose,* 481 U.S. 619, 107 S.Ct. 2029, 2033, 95 L.Ed.2d 599 (1987); *Simms v. Simms,* 175 U.S. 162, 167, 20 S.Ct. 58, 60, 44 L.Ed. 115 (1899); *In re Burrus,* 136 U.S. 586, 593–94, 10 S.Ct. 850, 852–53, 34 L.Ed. 500 (1890). "State-crafted family law mechanisms should not be disturbed by federal court intervention unless

the Ninth Circuit noted that Mrs. Shaver had custody of three children, was unemployed and possessed no special job-related skills, and was in need of support at the time of the separation. In contrast, Mr. Shaver was the sole owner of a car dealership and had substantial income. The court also pointed to the fact that the agreement provided for installment payments to her over a substantial period of time and that the payments would cease upon her death. The court noted that under Indiana law Mrs. Shaver would not have been entitled to alimony, but held that this was of no moment.

■ The evidence in the present case leads this Court to no other conclusion but that the $600.00 monthly obligation was intended to be in the nature of support. Mr. Jackson testified that from the beginning of the separation he voluntarily offered to pay to Mrs. Jackson $1,000.00 per

month in child support, but that Mrs. Jackson's attorney insisted that the payments be designated as $400.00 per month for child support and $600.00 per month for alimony. Mrs. Jackson testified that she conveyed her demand that the $1,000.00 payment be divided as $400.00 for child support and $600.00 as alimony. According to Mr. Jackson, as long as the children got the $1,000.00 per month, he did not care how. Mr. Jackson (while testifying that he never discussed alimony with Mrs. Jackson) further testified that throughout the negotiations he agreed to pay the $600.00 as long as it was not labeled alimony. Mr. Jackson, on cross-examination, admitted that he "presumes she needed support" and understood that his obligation was a monthly one that extended for the rest of Mrs. Jackson's life if she did not remarry.[14]

there is an unmistakable mandate from Congress to do so in order to achieve a valid federal objective." *Forsdick,* 812 F.2d at 804. In order to enforce the public policy favoring enforcement of familial obligations, Congress enacted § 523(a)(5) to require that bankruptcy courts make a limited inquiry into whether or not the obligation at issue is in the nature of support. "Thus, limited to its proper role, the bankruptcy court will not duplicate the functions of state domestic relations courts, and its rulings will impinge on state domestic relations issues in the most limited manner possible." *In re Harrell,* 754 F.2d 902, 907 (11th Cir.1985).

A bankruptcy court determination that an obligation is actually in the nature of alimony, maintenance or support does not usurp a state court from exercising continuing jurisdiction over the obligation. For example, under La.Civ. Code Art. 160, an award of alimony is subject to being reduced or increased by the state court on the basis of a finding that there has been a change in circumstances of the parties (*i.e.,* increased or decreased need; increased or decreased ability to pay). The analysis adopted by this Court leaves this authority undisturbed; the *Calhoun* and *Singer* analysis leaves this authority eviscerated. (Also, and as something of a practical aside, this Court is curious as to how a federal court gets rid of a jurisdiction once it exercises it as a state family court; do the parties in the case of permanent alimony, for example, retain the right (or remain bound) to periodically litigate within the bankruptcy court issues such as increased or decreased need or ability to pay? To such a possibility, this Court says, "Thanks, but no thanks.")

Other courts have pointed out as well that it appears obvious when comparing the language

of §§ 523(a)(5)(B) and 523(a)(8)(B) that Congress did not intend for the bankruptcy court to make an inquiry into the present circumstances in connection with § 523(a)(5). Unlike the "support" exception from discharge, the "educational loan" exception specifically provides for a "present circumstances" analysis. Section 523(a)(8) treats government-guaranteed student loans as nondischargeable "unless excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents." "The omission of a similar provision in § 523(a)(5) is convincing evidence of Congressional intent not to have bankruptcy courts become enmeshed in ongoing financial disputes between a debtor and a present or former spouse." *In re Stone, supra* at 639. *See also Forsdick v. Turgeon, supra.* In summation, this Court, unlike the Sixth Circuit, will leave determinations as to whether present (or changed) circumstances should affect the amount of a support award to the state tribunals and to state law.

**14.** In his deposition, introduced at trial, family court counsel for Mr. Jackson testified concerning the language giving rise to the obligation to pay the $600.00 until Mrs. Jackson died or remarried as follows:

"I just don't know why that was put in there. That, I guess, is—despite the fact that I put this language about the community property partition agreement and all of that stuff in the judgment, the kicker is this language about the marriage and her death, and I just don't know. I've fought with that every (sic) since I found out I was going to be giving this deposition. I cannot recall why that was put in there. I just don't know. I have no recollec-

The bases for Mr. Jackson's unwillingness to call the payment alimony were, according to his testimony, twofold: (i) he was concerned about the effect the payment of "alimony" would have on his reputation in the real estate business and was concerned about the embarrassment· and humiliation that he perceived he would suffer if the community learned that he was paying "alimony"; and (ii) he steadfastly believed Mrs. Jackson to be at fault in the marriage and thereby not entitled to alimony under Louisiana law (the parties stipulated to mutual fault as the basis of the legal separation). Mr. Jackson's vehement assertion of his intention that the payment not be considered alimony is offset by the testimony of Mrs. Jackson that she always intended it as alimony [15] and his own testimony that he presumed Mrs. Jackson needed support and was willing to pay her until she died or remarried (the basic term of permanent alimony established under Louisiana state law–La.Civ.Code Art. 160(A)(4)). The Court finds Mr. Jackson's unwillingness to subject himself to the perceived derision from the community if he owed the money under the label of "alimony" (to Mr. Jackson, apparently, tantamount to the Scarlett A) is not credible evidence of intent that the obligation not be in the nature of alimony or support.

As additional evidence of his intention that the $600.00 payment represented a true property settlement obligation, the defendant attempted to show that the present value of the $600.00 monthly payment stream approximated equivalent consideration for the community property transfered by Mrs. Jackson to Mr. Jackson (assuming a full life expectancy, counsel for Mr. Jackson argued that the present value of the payment stream was about $58,000). However, the Court is not persuaded by this property value analysis performed some four and one-half years after the fact. As of the separation judgment and community property partition neither the parties nor their lawyers had made any calculation as to the value of the property transferred between Mr. and Mrs. Jackson (the testimony of Mr. Jackson, Mrs. Jackson and Mr. William Carmichael—Mr. Jackson's domestic counsel—are in unison on this point). Also, the after-the-fact calculations are rendered utterly irrelevant by Mr. Jackson's testimony as to what calculation or assumption he was *actually* operating under as of the separation. Mr. Jackson testified that he, in fact, believed his wife would get remarried, that she would not remain unmarried for long (so that he probably would have to pay very little of the $600.00 per month payments). The parties arrived at the $600.00 figure outside the discussions held before counsel, without consideration of relative property values; by taking $600.00 out of the original $1,000.00 offer to the children and attributing it to Mrs. Jackson. If, in fact, Mr. Jackson's assumption (hunch) had been correct (Mrs. Jackson quickly remarrying), the amount paid up until that time would not have come close to the value necessary (according to Mrs. Jackson's counsel) to be considered an equalizing payment.

Furthermore, it is a common practice in cases of true property settlements where one spouse receives an amount of property having greater value than the other that the equalizing debt is represented by a promissory note. The difference is a fixed, determinable amount calculated on the comparative values of property received is not conditioned upon the personal marital status of either party and constitutes a debt that could be collected from the estate of the received spouse if the spouse dies before payment is effected. Here, not only was no promissory note given, but the payments were stated (in both the separation agreement and the community property partition) to terminate upon Mrs. Jackson's death or remarriage.

---

tion of it as to why I did that or why that was the agreement. I think that that (sic) really—the only thing that I can say is that's what they agreed to. That's what they came to us with, and that's what we put down." (dep. p. 22–23).

**15.** Had his testimony regarding his intention been uncontradicted, "even the uncontradicted testimony of one of the spouses is not decisive." *Benich, supra,* at 945.

The Court also finds that Mr. Jackson's presumption that Mrs. Jackson was in need of support was correct. All three minor children resided with her and she was unemployed. She did not have a college education and possessed no special skills or expertise. She had not worked in some years, opting to stay home with her children, in part because Mr. Jackson wanted her to. In contrast, Mr. Jackson had an annual income from a real estate business.

Finally, Mr. Jackson's United States income tax returns show that he considered the payments to be alimony. Although the 1985 return does not show a deduction for alimony, the 1984 return shows the amount of $7,200 as "alimony paid," and the 1986 return shows a deduction of $10,655. Likewise, Mrs. Jackson's tax returns reflect that she received alimony in the amount of $4,800 in 1983, $7,200 in 1984, and $7,045 in 1986 (neither party could explain why alimony was not deducted from Mr. Jackson and taken as income by Mrs. Jackson in 1985). The Court notes that the Jacksons, after their divorce, utilized the services of the same accountant. Mr. Jackson testified that he told his accountant that he never agreed to pay alimony, but that he let the alimony description go on his tax return because of the tax consequences. He further acknowledged that it was to his advantage to call the payments alimony and that he took the advantage.

This Court, upon the foregoing, finds that the evidence clearly establishes that the $600.00 per month was intended to be a support obligation as contemplated by § 523(a)(5) and is therefore nondischargeable.

### The Child Support Arrearage

As mentioned above, Mr. Jackson has advanced (and introduced evidence attempting to support) the argument that the $400.00 per month child support obligation has been fully paid, as the amount of the obligation was reduced prior to bankruptcy. Mr. Jackson attempted to show at trial that

prior to the filing of the bankruptcy petition (and during the time thereafter) the children lived with him much of the time, that certain of the children reached the age of majority prior to bankruptcy, and that he, in fact, bore the majority of the financial burden of child custody. Through argument and brief, counsel has argued that the child support obligation was, in fact, reduced, that Mrs. Jackson acquiesced in the reduced payments set by Mr. Jackson, and therefore that any child support obligation has been satisfied. This argument, as shown above, acquires added significance in light of this Court's finding that the $600.00 payment is nondischargeable (if the child support obligation was reduced, more of the pre-petition payments can be allocated to the $600.00 support obligation).

■ In the absence of some overriding federal interest which requires a different result, "[p]roperty rights are created and defined by state law." *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). Although the bankruptcy court is required to use federal law to make the determination as to whether an obligation is in the nature of support, the court must look to state law to determine the relative property rights of the parties once an obligation is found to be "support." [16] Since the defendant has admitted that the child support debt was in the nature of support under § 523(a)(5), but argues that this support obligation has been fully satisfied under state law, the dispute over the child support focuses upon the property rights of the parties under Louisiana state law. *See Stellwagen v. Clum,* 245 U.S. 605, 38 S.Ct. 215, 62 L.Ed. 507 (1918); *Sturges v. Crowninshield,* 4 Wheat. 122, 4 L.Ed. 529 (1819); *Ogden v. Saunders,* 12 Wheat. 213, 6 L.Ed. 606 (1827).

In the original judgment of separation, Mr. and Mrs. Jackson stipulated to an *in globo* award of $400.00 per month in child support for the three minor children. Additionally, the parties entered into a decree of

16. Neither party has suggested, nor does this Court find that the federal bankruptcy laws would govern the treatment of the child support arrearages in this case. The clear intention of the parties was that the $400.00 payment was for child support.

joint custody with liberal visitation privileges. At the time the judgment of separation was entered, the three minor children were residing with their mother. From that point until the youngest child reached the age of eighteen in November of 1987, the children resided with their parent of choice. The defendant asserted that as each child left his mother and moved in with his father, Mr. Jackson adjusted the child support payments ratably downward. This Court finds that although the facts adduced at trial show some mathematical correlation between the number of children residing with the Plaintiff and the amounts of the payments, the Defendant did not carry his burden in proving a modification of child support as is required under Louisiana state law.

"The general rule in Louisiana is that an alimony or child support judgment remains in full force and effect in favor of the party to whom it is awarded until the party ordered to pay it has the judgment modified or terminated by a court." *Vallaire v. Vallaire*, 433 So.2d 315, 317 (La.App. 1st Cir.1983). *See also Halcomb v. Halcomb*, 352 So.2d 1013 (La.1977). However, the courts have recognized two exceptions to this general rule: (1) a credit has been given when the parties have clearly and expressly agreed to waive or otherwise modify the court-ordered payments (*see, e.g., Dubroc v. Dubroc*, 388 So.2d 377 (La. 1980); *Burbano v. Burbano*, 417 So.2d 400 (La.App. 4th Cir.1982)); and (2) where the recipient spouse voluntarily delivers physical custody to the payor-spouse, an *implied* agreement has been found due to the mutual understanding between the parents that the payor-spouse would assume sole responsibility for feeding, clothing, and sheltering the child.[17] *See, e.g., Henson v. Henson*, 350 So.2d 979 (La.App. 2d Cir. 1977); *Caraway v. Caraway*, 321 So.2d 405 (La.App. 2d Cir.1975); and *Silas v. Silas*, 300 So.2d 522 (La.App. 2d Cir.), *writ refused*, 303 So.2d 177 (La.1974).

This Court does not find that either of these exceptions should apply in the present case. The Defendant has failed to produce any evidence of an express agreement to modify the child support obligation. Mrs. Jackson testified that during the entire period of time since separation, she had never talked with her husband about reducing the payments. She also stated that whenever she attempted to communicate with him, he "hung up the phone" or "said something ugly." Nevertheless, the Defendant suggests that the Plaintiff must have agreed to the reduction of the child support payments "obviously because she knew that it was only just that the child support be adjusted ratably downward." *Memorandum on behalf of Defendant, H.T. Jackson, Jr.,* at 8. However, this Court will not infer an express agreement between the parties on the basis of Mrs. Jackson's supposed but unspoken agreement with counsel's concept of natural justice.

In the recent case of *LaBove v. LaBove*, 503 So.2d 670 (La.App. 3d Cir.1987), the Louisiana Third Circuit Court of Appeal was faced with a similar issue. In that case the husband argued that since his wife accepted the reduced payments and made no demands for the balance, she acquiesced in the amounts tendered. In response to that argument, the court stated:

> The law is clear that failure to make periodic demands for child support does not stop a wife from claiming the accrued amount. *Vaughn v. Vaughn* [Vaughan v. Vaughan], 415 So.2d 483 (La.App. 1st Cir.1982); C.C.P. Art. 3945. So, ... [the wife's] failure to demand the proper amount of child support is of no moment.

> In addition, the mere acquiescence to a lesser amount of support never amounts to a waiver of support. *Dubroc v. Dubroc,* 388 So.2d 377 (La.1980).

*LaBove,* 503 So.2d at 673. Likewise, Mr. Jackson's argument that an express agreement was effected by means of Mrs. Jack-

---

**17.** The "implied agreement" exception has only been recognized by the Louisiana Second Circuit Court of Appeal.

son's acquiescence in accepting lower payments, must fail.

The Defendant alternatively attempts to show that an implied agreement existed between the parties. Even assuming that Mrs. Jackson voluntarily relinquished custody of the children as each left, the cases which have found the existence of implied agreements are clearly distinguishable. In *Vallaire*, the court distinguished those cases which have found implied agreements:

> In the *Caraway* case, there was only one child born of the marriage. In *Henson* and *Silas* there was more than one child involved, but all of the children had been transferred to the custody of the father. To the contrary, in the present case, we have an in globo award of $75 which was for the support of three children. Only one of the children changed physical custody.

*Vallaire*, 433 So.2d at 318. In this case there was an *in globo* award but *pro rata* reduction by Mr. Jackson as he took custody of each child (at different times) that moved in with him.

In his memorandum, counsel for the Defendant cites *Bagby v. Dillon*, 434 So.2d 654 (La.App. 3d Cir.1983) in support of the finding of an implied agreement. The court stated that "[W]hile the evidence does not clearly show that plaintiff voluntarily placed her custody with defendant, it does show that plaintiff had no objections thereto. Plaintiff never took any action to regain actual custody ..." However, counsel for the Defendant failed to quote the next paragraph of the opinion wherein the court noted:

> We acknowledge the jurisprudence to the effect that where there is an *in globo* award of child support for more than one child, the father is not entitled, without seeking court modification of the judgment, to reduce the child support payments on a pro-rata basis, even where the child support is no longer due for one of the children because of majority or other reasons. *Gautreaux v. Gautreaux*, 382 So.2d 996 (La.App. 1 Cir. 1980); *Wisdom v. Wisdom*, 356 So.2d

1111 (La.App. 2 Cir.1978); *Blankenship v. Blankenship*, 382 So.2d 982 (La.App. 1 Cir.1980). However, we have already found that, by agreement of the parties, there was *no in globo* award made to plaintiff for child support, but rather a specific award of $300 per month per child. Thus, these cases are distinguishable on their facts from the action *sub judice.*

434 So.2d at 660 (emphasis added). Unlike the award in *Bagby,* the award to Mrs. Jackson was clearly an *in globo* award.

The courts have distinguished the treatment of modifications of *in globo* awards because of the policy reflected in Louisiana Revised Statute 9:309. The statute provides in pertinent part as follows:

> When an order or judgment awards child support in globo for two or more children, said child support award shall terminate automatically and without any action by the obligor to reduce, modify, or terminate the award when the youngest child for whose benefit the award was made attains the age of majority.

La.Rev.Stat.Ann. 9:309(B). The First Circuit discussed the rationale of this policy choice in *Vallaire:*

> We believe the above cited statute shows the legislature was cognizant of the rather peculiar nature of an in globo award. An in globo award is made in an attempt to give the mother a sum of money with which (in addition to her own resources) she can adequately support the children. The fact that one child no longer resides with the mother does not necessarily mean her expenses in supporting the family are reduced by that proportionate amount. Whereas in the situations in the *Silas, Henson* and *Carraway* cases, it would be undisputed that the mother no longer had any expenses for the children while they were all residing with their father; that is not the case when one of the children remains with the mother and one resides with the father.

*Vallaire*, 433 So.2d at 319. *See also Weatherspoon v. Weatherspoon*, 433 So.2d 319 (La.App. 1st Cir.1983). Because the Defendant failed to prove that Mrs. Jack-

son voluntarily delivered custody of all the children and that he cared for *all* of the minor children, this Court finds no evidence of an implied agreement to modify the support award. Since the Court finds no implied agreement, it need not delve into what it perceives to be a split among the Louisiana Circuit Courts as to whether an implied agreement can form the basis for the reduction of a child support award. There having been no state court-ordered reduction of child support obligation, and the Court finding no express or implied agreement on the part of Mrs. Jackson to reduced child support payments, this Court finds that the child support obligation up to the date of the bankruptcy petition was $400.00 per month.

### Amount of Judgment and Interest Thereon

The parties have stipulated that Mr. Jackson paid $12,176.31 less than called for within the Separation Judgment and Community Property Partition Agreement up through the bankruptcy petition date. The evidence shows that he paid at least $400.00 each month. On the basis of La. Civ.Code Art. 1868 (and the acknowledgement of both parties that payments should be imputed first to child support) the Court finds that the entire $12,176.31 is attributable to the support obligation owed by Mr. Jackson, as the child support obligation was fully paid. The parties further stipulated that a payment of $2,013.87 was received by Mrs. Jackson from the debtor's estate.

While the question of whether the obligation is actually in the nature of alimony or support is one of federal law, the extent of the pre-petition obligation (*e.g.* reduction of child support, imputation of payments and interest thereon) should be determined under state law. This approach, as mentioned above, is consistent with *Benich, supra; Shavers, supra,* but contrary to *Calhoun, supra* and its progeny. Since the $600.00 obligation is for bankruptcy and discharge liability purposes, an obligation in the nature of alimo-

ny, maintenance and support, this Court will treat this obligation as an alimony judgment for purposes of determining the interest due on the judgment. The state law on this issue requires that interest shall accrue upon each past due payment from the date the payment was due, until paid, as opposed to accruing from the date of judicial demand. *Caire v. Caire,* 452 So.2d 194 (La.App. 4 Cir.1984); *Marshall v. Marshall,* 390 So.2d 1365 (La.App. 4 Cir. 1980). The $2,013.87 payment to Mrs. Jackson from the estate shall be first imputed to interest and then toward reduction of the principal due. La.Civil Code Art. 1866.

Judgment is granted in favor of the Plaintiff, Linda K. Sharkey Jackson in accordance with these reasons. A separate judgment will be signed this date.