**In re Denis BRODY, Debtor.**

**Carol BRODY, Plaintiff,**

v.

**Denis BRODY, Defendant.**

**Bankruptcy No. 188–81418–352. Adv. No. 188–0196.**

United States Bankruptcy Court,
E.D. New York.

Nov. 2, 1990.

See also 97 B.R. 158.

Gainsburg, Greene & Hirsch by Hal Hirsh, Neil Berger, New York City, for debtor, Denis Brody.

Dreyer & Traub by Edward H. Tillinghast, III, Martin Klein, New York City, for plaintiff, Carol Brody.

## DECISION AFTER TRIAL TO DETERMINE DISCHARGEABILITY OF MATRIMONIAL OBLIGATION

MARVIN A. HOLLAND, Bankruptcy Judge:

The debtor's ex-wife seeks to have $1,000,000 in payments due her pursuant to a Separation Agreement declared nondischargeable as support pursuant to 11 U.S.C. § 523(a)(5). We find nondischargeable only so much of the unpaid balance of that portion of the $1,000,000 marital obligation as may be necessary to provide the debtor's ex-wife with $100,000 a year in support for life and reserve for further hearing a determination of the amount necessary to purchase or guarantee such payments.

## FACTUAL BACKGROUND

Denis Brody and Carol Brody were married on July 31, 1969. (Tr., 8/3/89 at 64).[1] They had two children. (Tr. at 65). In June of 1982, Mr. Brody left the marital home. At the time, he was working as an attorney and CPA, while Mrs. Brody was a homemaker. She previously had been employed as a geriatric case worker, and, subsequently, as an administrative assistant in Mr. Brody's office. She received no pay while working for Mr. Brody.

Even before Mr. Brody left the marital home, he and Mrs. Brody began negotiating the terms of their marital dissolution. These negotiations continued intermittently over four years. The bulk of negotiating took place at three separate meetings between the parties and their respective counsel.

On January 24, 1986, the parties executed a voluntary Separation Agreement. (Def.'s Exh. 1). Article 8 of this agreement obligates Denis Brody to pay to Carol Brody $1,083 per month, per child for child support. In addition, Article 8 requires Denis Brody to pay the children's full private school expenses for the school year 1986–87, and one-half of these private school expenses thereafter.

Article 10 provides for Denis Brody to pay $3,325 per month to Carol Brody as support and maintenance for a period of 36 months with such payments to terminate on the earlier of the death of either party or upon Carol Brody's remarriage or cohab-

1. All transcript references are to the transcript of 8/3/89.

itation with an unrelated man for over one year.

■ Article 12 of the Separation Agreement is the subject of the dispute herein. Entitled "Distributive Award",[2] it provides for Denis Brody to make a payment of one million dollars ($1,000,000) to Carol Brody: $400,000 to be paid on the earlier of August 1, 1986 or the closing of title on their marital abode, with the remainder to be paid in installments with 9% interest as follows:

| Date | Principal | Interest | Total |
|------|-----------|----------|-------|
| 8/1/87 | $182,000 | $16,380 | $198,380 |
| 8/1/88 | 170,000 | 30,600 | 200,600 |
| 8/1/89 | 156,000 | 42,120 | 198,120 |
| 8/1/90 | 92,000 | 33,120 | 125,120 |

Carol Brody's counsel drafted the Separation Agreement.

On or about August 1, 1986, Denis Brody made the $400,000 payment to Carol Brody. None of the remaining $600,000 of the Article 12 payment has been paid. After Denis Brody defaulted, Carol Brody commenced an action against him in New York State Supreme Court seeking a money judgment for the unpaid 8/1/87 payment. The state court granted summary judgment for Carol Brody. Denis Brody has also defaulted on his obligations to pay support to Carol Brody under Article 10 of the Separation Agreement. These support defaults were the subject of two contempt motions brought on by Carol Brody in State Supreme Court.

The parties were divorced on April 29, 1987. Denis Brody filed a petition for relief under Chapter 11 on May 25, 1988. The instant adversary proceeding seeks a determination of dischargeability pursuant to 11 U.S.C. § 523(a)(5) with regard to the remaining $600,000, plus interest, owed to her by virtue of Article 12 of the Separation Agreement.

### LAW

Bankruptcy Code section 523 provides that

(a) A discharge under section ... 1141 ... of this title does not discharge an individual debtor from any debt—

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in—accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that

B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance or support; ...

■ The determination of whether a marital obligation contained in a separation agreement or divorce decree is nondischargeable alimony, maintenance, or support or a dischargeable property settlement agreement pursuant to section 523(a)(5) is a matter of federal bankruptcy law. *Forsdick v. Turgeon*, 812 F.2d 801, 802 (2d Cir.1987); *Sylvester v. Sylvester*, 865 F.2d 1164, 1166 (10th Cir.1989); *In re Calhoun*, 715 F.2d 1103, 1107 (6th Cir.1983); *In re Raff*, 93 B.R. 41, 45 (Bankr.S.D.N.Y.1988) (citing cases); *In re Petoske*, 16 B.R. 412 (Bankr.E.D.N.Y.1982); H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 364 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 6320.

■ Prerequisite and fundamental to an adjudication of dischargeability is a determination of the intent of the document which created the liability as manifested by the character of the underlying obligation whose dischargeability is being determined, independent of the terminology used. This is so whether the obligation arises out of a negotiated separation agreement, or a judicial decree. The criteria discussed by courts in determining whether an obligation is a dischargeable property settlement or non-dischargeable alimony, mainte-

---

2. Although the term "distributive Award" has a statutorily defined meaning under New York law, under Federal bankruptcy laws labels do not control the determination of a discharge-

ability issue. *Sylvester v. Sylvester*, 865 F.2d 1164 (10th Cir.1989); *In re Benich*, 811 F.2d 943 (5th Cir.1987); *Forsdick v. Turgeon*, 812 F.2d 801 (2nd Cir.1987).

nance, or support are many and varied.[3] However, they are applied with a view towards a determination of intent; either intent as expressed, or intent as inferred from the function which the obligation appears to fulfill, or by the conduct of the parties.[4]

▆ Intent as used in this context refers to the purpose served by the obligation in question, rather than the motivation of the parties with regard to the issue of dischargeability. While intent as to purpose is persuasive as to dischargeability, intent as to dischargeability is not necessarily persuasive of purpose. Just as every obligee wants the obligation to be nondischargeable, every obligor intends otherwise. Function therefore becomes the test to resolve conflicting, ambiguous, or unclear manifestations of intent.

Where the intent is clear from the document in question and where this intent is consistent with the function actually served by the clause out of which the obligation was created and is not contrary to any overriding public policy or compelling equitable consideration, there is no reason for the bankruptcy court to go further. A property settlement is dischargeable; support is not.

Reality, however, is rarely that clear. Sub-paragraph (B) of § 523(a)(5) recognizes that matrimonial courts and bankruptcy courts do not necessarily speak the same language. What state courts or matrimonial litigants had denominated "alimony", "maintenance" or "support" prior to any contemplation of bankruptcy, is not necessarily what Congress intended when it used those words in § 523(a)(5). In resolving the applicability of that section, the bankruptcy court must therefore first determine from the general sense of the document what was intended by the state court or the parties without being overly concerned with specific wording used.

Furthermore, actual situations rarely if ever fall neatly and clearly within the dichotomy envisioned by lawmakers. The $1,000,000 agreed upon would provide Carol Brody with a share of the family fortune; it would be an asset which she could transfer by will or inter vivos, an asset which would be reflected on her personal financial statement and which would enhance her personal borrowing capacity, or, if she elected, an asset which she could consume within a short period of time. As such it certainly manifests the indicia of a property settlement. On the other hand,

---

**3.** Some of the factors considered by courts who utilize this approach include the following: the ability of the beneficiary (creditor) spouse to obtain gainful employment, *Forsdick v. Turgeon*, 812 F.2d at 803; the characterization given the award by a state court determination, if any, *Id.;* the length of the marriage, *In re Eisenberg*, 18 B.R. 1001, 1003 (Bankr.E.D.N.Y.1982); the relative earning power of the parties, *Id.;* whether there was issue of the marriage, *Id.;* the context in which the debt appears in the decree, *In re Brown*, 74 B.R. 968, 971 (Bankr.D.Conn.1987); whether the obligation terminates upon the death or remarriage of the obligee, *Id.;* whether the obligation balances the income of the parties, *Id.*

**4.** A variation of this basic approach to the problem of dischargeability of matrimonial obligations emphasizes the intent of the parties. Under this view, the intent of the parties, with regard to the function that the award was intended to serve, is regarded as the single most important issue in determining dischargeability. This approach looks for factors from which the underlying purpose of the award may be determined and/or the parties actual intentions as to

providing support or dividing property might be apparent. This approach finds one of its strongest proponents in the Eighth Circuit. "It is well-established in the Eighth Circuit that the crucial question in determining whether a debt is dischargeable, pursuant to 11 U.S.C. § 523(a)(5)(B), is what function was the stipulation and/or decree intended to serve." *In re Williams*, 703 F.2d 1055 (8th Cir.1983); *In re Hoffman*, 101 B.R. 578, 581 (Bankr.E.D.Mo. 1989); *See also, Hixson v. Hixson*, 23 B.R. 492 (Bankr.S.D.Ohio 1982); *In re Jensen*, 17 B.R. 537, 540 (Bankr.W.D.Mo.1982); *In re Petoske*, 16 B.R. at 412. Under this approach the crucial factor in determining the dischargeability of a matrimonial obligation is the function the award was intended to serve. Most of the factors that courts use are to determine a presumed intent. The factors become especially valuable when, as is often the case, the manifest intent of the parties is unclear. "In the absence of clear intent, bankruptcy courts necessarily refer to various factors ... Included in these factors are: disparity in earning power, business opportunities, level of education, physical health, [and] probable future need, ..." *In re Raff*, 93 B.R. 41, 47 (Bankr.S.D.N.Y.1988).

without the lump sum there would be no way for Carol Brody to enjoy the standard of support envisioned by the agreement. Is the agreed upon $1,000,000 obligation therefore a dischargeable property settlement or a nondischargeable liability "in the nature of alimony, maintenance or support"? [5]

## ARGUMENTS

The argument in favor of dischargeability, although not clearly articulated in quite this fashion by the debtor, is as follows:

The obligation to Carol Brody is a lump sum, or a small number of discrete payments. It was not contemplated that this lump sum per se would constitute her support, but rather that she would invest this fund and use the income therefrom for that purpose. That the lump sum itself therefore was not intended to be used as support is clear from the testimony offered on her behalf that she believed that by conserving the lump sum and investing it prudently, she could generate sufficient income to support herself and still have the $1,000,-000. If Carol Brody were able to generate

more income from that lump sum than was contemplated, no portion of the principal sum was to be returned to Denis Brody. Were she to expend this lump sum so frivolously as to render herself unable to generate the expected income she would have no right to go back to Denis Brody and ask for an increase. Payments intended as income are generally consumed by using them for support. Payments intended as a property settlement are generally contemplated to be conserved and invested with only the proceeds used for various purposes, including, at times, support. Carol Brody was to have the exclusive right to determine how this money was to be disposed of or invested.

The only obligation imposed upon Denis Brody was to pay the lump sum itself; he had no obligation to assure that it was used to generate income or that it be used for support. The lump sum once paid to Carol Brody was to be free of Denis Brody's control. While the anticipated income from the lump sum might have been intended for Carol Brody's support, that income was not the obligation of Denis Brody. Rather it was Carol Brody's obligation not only to

**5.** Recent cases support the view that the intent of the parties as determined by an assessment of the function that the award was intended to serve is the critical inquiry that a court should make in determining whether an award is non-dischargeable alimony, maintenance, or support or a division of marital property rather than their current needs. In *In re Clark*, 105 B.R. 753 (Bankr.S.D.Ga.1989), the bankruptcy court considered the dischargeability of certain obligations contained in a marital separation agreement which was incorporated into a final judgment of divorce. The court stated that "where the obligations at issue are contained in a voluntarily executed settlement agreement between the spouses, a determination that those obligations are actually in the nature of alimony or support requires a determination that the parties had a mutual intent to have the obligations considered as such support at the time the agreement was made. In dischargeability disputes under section 523(a)(5), where the obligations at issue are contained in a voluntarily executed settlement agreement between spouses, a determination that those obligations are actually in the nature of alimony, maintenance or support requires a determination that (1) the parties had a mutual intent to have the obligations considered as such support at the time the agreement was made with that intent, absent a showing of ambiguity, mutual mistake, or fraud, determined from the plain language of

the agreement, and (2) the obligation at issue can legitimately be characterized as being in the nature of support." *Id.*

Similarly, in *In re Schweig,* 105 B.R. 140 (Bankr.D.C.1989), the bankruptcy court considered dischargeability issues in the context of a separation agreement. The court cited *In re Williams*, 703 F.2d 1055, for the general proposition that the court must make a factual determination of the intent of the parties in order to resolve the dischargeability questions. *Schweig* at 143. The court went on to specify criteria: "In order to make the determination of whether the debt falls into the category of support or maintenance on the one hand or of a property division on the other, the Court must ascertain the intent of the parties in regard to the obligation at the time of the ... agreement ... If the agreement itself does not plainly reveal the mutual intent of the parties, an examination of the circumstances out of which the agreement arose can be used to ascertain the parties' intent.... As a guide for determining intent, courts often examine the surrounding facts and circumstances in light of a list of factors, such as—(1) whether there was an alimony award entered by the state court, (2) whether there was a need for support at the time of the agreement in issue...." *Id.*

manage, invest, and assure a return, but also to use that return for her support. Denis Brody had neither the obligation nor the ability to do so. His obligation under the agreement was to cease upon payment of the principal sum. The $1,000,000 payment from Denis Brody to Carol Brody was therefore not a support payment even though the anticipated income therefrom might be so used. Moreover, the parties were sophisticated in money matters. Denis Brody is both a lawyer and an accountant whose business was the establishment of complicated tax shelters while Carol Brody is an attorney, although not a practicing one at the time in question. Were it the purpose and intent merely to provide Carol Brody with the expected support, it would have been more logical to have structured the transaction by setting up a trust with the income payable to Carol Brody for life and with Denis Brody retaining the remainder interest. Under the actual structure, it is Carol Brody and not Denis Brody who has control of the remainder principal sum, such that if she is able to generate the income contemplated, not only will she have this income for life but she will also have the additional separate and independent power to dispose of the entire lump sum on her death or indeed at any time prior thereto, should she so desire.

The opposing position argues that an intent for the Article 12 payments to provide her with support is demonstrated by Article 10 whose payments maintain the agreed upon level of income until the balance of payments on the $1,000,000 corpus of the Article 12 installment payments were completed; that the entire Separation Agreement was structured so as to provide for a level of support to be derived from the income generated by the $1,000,000 Article 12 payments; and that the Article 10 payments were designated and structured solely to make up the deficiency in income occasioned by the yet unpaid Article 12 payments; and that it would be impossible to preserve her ability to generate her nondischargeable income without preserving as nondischargeable the only fund from which her income could possibly be generated.

The rebuttal is simply that any property settlement can be invested and the income produced can always be used for support. If that possibility, by itself, were sufficient to transform a property settlement into nondischargeable support, no property settlement would be dischargeable.

## DISCUSSION

Two quotes from *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) are significant:

Of course, the "starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (POWELL, J., concurring). But the text is only the starting point. As Justice O'CONNOR explained last Term, " ' "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy" ' " *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 221, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986) (quoting *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956) (quoting *United States v. Heirs of Boisdore,* 8 How. 113, 122, 12 L.Ed. 1009 (1849))).

479 U.S. at 43, 107 S.Ct. at 358

and

"[W]e do not read these statutory words with the ease of a computer. There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966).

479 U.S. at 49, 107 S.Ct. at 361.

█ A reading of the agreement amply demonstrates that the Article 12 payments do not neatly fall into the property settlement versus maintenance and support dichotomy. Not only do they effect a division of marital property, but they were intended to provide Carol Brody with support as well. After Denis Brody left the

marital home, he voluntarily continued to make direct payments for substantial household bills and expenses. These included mortgage payments, real estate taxes, and insurance. (Tr. at 67, 68, 69). Also, as the parties' children continued to live with Carol Brody, Denis Brody paid for the children's medical expenses. (Tr. at 68, 69). Carol Brody and Denis Brody agreed on an approximate amount of support of $100,000 per year for life for Carol Brody. Carol Brody testified that even while she and Denis Brody were still living together in their marital home, Denis Brody offered to support her upon their separation: "At that time he told me he would match Johnny Carson to his second wife Joanne, and give me $100,000 a year for the rest of my life." (Tr. at 71).

Carol Brody rejected this offer for fear that Denis Brody would not make the payments as agreed or would not make them timely. (Tr. at 72). In response, Denis Brody proposed an up front payment of $1,000,000. (Tr. at 72). However, at a meeting between the parties (and their respective counsel) Denis Brody modified the offer to $1,000,000 payable in installments. He also proposed interim payments intended to provide Carol Brody with supplemental support during the three year period that it would take Denis Brody to make the $1,000,000 installment payments. (Tr. at 75). As Carol Brody testified, "The numbers were played with then ... [h]e tried to explain to me how with each pay coming in to me I would need less and less and after three years I would be able to live off the interest it generated." (Tr. at 75).

Both parties realized and intended that Carol Brody would use some portion of the Article 12 payment as support even though Article 12 was designated as a "Distributive Award" in the Separation Agreement. Since the $1,000,000 was to be paid in four installments over three years, the full amount of the $1,000,000 would not be immediately available to Carol Brody. Thus, during the three-year period of the installment payments the parties agreed that Denis Brody would make interim monthly payments to Carol Brody intended to be used to supplement the funds available for her support until the $1,000,000 corpus was intact to produce the full benefit that the parties intended. As Carol Brody testified, "Article 12 was the one million dollars that I was to or believe I was to get to support myself and live on for the rest of my life. Article 10, when [was] his offer to supplement me until Article 12 was received by me, so I would have enough money to live with." (Tr. at 77).

Further support for Carol Brody's argument can be found in the way the parties' Separation Agreement allocates the payments for the Brody children's private school expenses. Article 8 requires that Denis Brody pay all private school expenses for the school year 1986–87. The Separation Agreement further requires that after the 1986–87 school year, Carol Brody must pay one-half of these private school expenses. This timing coincides with Carol Brody's anticipated receipt by September of 1987 of an aggregate of $598,380 under Article 12 of the Separation Agreement. "It was contemplated that the first $400,000 with the support provisions would not give me enough money to be able to pay anything more than the minimal support that the children and I needed and by the next year the first $200,000 payment was to come in and he felt after the interest generated, I would be able to cover half the school tuition." (Tr. at 80).

Further, Mr. Dominic Barbara, who drafted the Separation Agreement, testified (Tr. at 31) that the reason that Article 12 was not labelled as a support provision is that the parties did not discuss with Mr. Barbara the exact structure and phrasing of each article of the agreement. Rather, the parties were concerned that the substance and content of the agreement substantially reflect the parties intent. As her attorney, Mr. Barbara, testified:—

QUESTION: During the meetings that you had with Mr. Ostrow [Denis Brody's counsel] and Mr. and Mrs. Brody, which led up to and occurred sometime immediately prior to when the agreement was drafted, what did they ask you to include in Article 12 when you were drafting Article 12?

ANSWER: There was no discussion about Article 12 in particular. We didn't say in our meetings what is going to be in Article 8 or Article 10, it's not just discussed that way.

(Tr. at 31).

Our conclusion that the parties intended that the Article 12 payments provide the basis for support of Carol Brody is not based solely on the subjective testimony of the parties themselves. An independent review of the circumstances utilizing the factors approach [6] to determine the intent of the parties militates equally toward this result. Our inquiry seeks, to determine, generally, whether there was a need for support at the time that the parties entered into the agreement. *In re Schweig*, 105 B.R. 140, at 143 (Bkrtcy.D.Colo.1989). We find that there was such a need for support.

■ Another factor weighing upon dischargeability of a matrimonial obligation is the relative ability of the parties to obtain gainful employment. *See Forsdick v. Turgeon*, 812 F.2d 801, 803. Although Carol Brody had recently earned a law degree, she obtained this degree only after sixteen years of marriage and had not been able to secure substantial full-time employment.

Denis Brody has a history of earning a high income, (Tr. at 67), which, in all likelihood, Carol Brody will never be able to match because of her late entry into the work force. Denis Brody's higher earning ability at the time of the execution of the agreement manifests an intent to provide support for Carol Brody.

It therefore becomes evident that while Article 12 of the Separation Agreement designates the payments as a "Distributive Award",[7] this label does not supersede the intent manifested by the parties' agreement. We hold that while the $1,000,000 obligation is clearly a property settlement, it is equally clear that "such debt includes a liability ... actually in the nature of alimony, maintenance or support; ..." in that the parties intended that the lump sum settlement would constitute a fund which Carol Brody could invest and whose income she would utilize for support.

■ A property settlement otherwise dischargeable may be rendered "actually in the nature of alimony, maintenance, or support" and thus become nondischargeable where both of the spouses intended that one of the primary functions to be served

6. One factor rejected by the majority of courts in making the determination of whether a matrimonial obligation is dischargeable is the current needs or change in circumstances test, under which the bankruptcy court would look to the current economic circumstances of the parties, and how they may have changed since the marital obligation was incurred. The current needy financial circumstances of a party would then influence the bankruptcy court in its determination of whether a particular marital obligation should be discharged. This approach was announced by the Sixth Circuit in *Long v. Calhoun (In Re Calhoun)*, 715 F.2d 1103 (6th Cir.1983). "[The bankruptcy court] must ... inquire whether ... [an obligation intended as support] has the effect of providing the support necessary to ensure that the daily needs of the former spouse and any children of the marriage are satisfied. The distribution or existence of other property, for example, may make the [obligation] unnecessary for support, as might drastic changes in the former spouse's capabilities for self-support ... If without the [obligation] the spouse could not maintain the daily necessities, such as food, housing and transportation, the effect of the [obligation] may be found [to be nondischargeable support] ... If the [obli-

gation] is not found necessary to provide such support, the inquiry ends and the debtor's obligation ... must be discharged." *Calhoun*, 715 F.2d at 1109. Since this *Calhoun* approach has the effect of modifying the underlying obligation on the basis of "changed circumstances" the Second Circuit has explicitly rejected it as unduly "interfering with the delicate state systems for dealing with the dissolution of marriages and the difficult and complex results that flow therefrom", *Forsdick v. Turgeon*, 812 F.2d at 803–804.

7. New York Domestic Relations w Section 236(B)(1)(b) provides that

The Term "distributive award" shall mean payments provided for in a valid agreement between the parties or awarded by the court, in lieu of or to supplement, facilitate or effectuate the division or distribution of property where authorized in a matrimonial action, and payable either in a lump sum or over a period of time in fixed amounts. Distributive awards shall not include payments which are treated as ordinary income to the recipient under the provisions of the United States Internal Revenue Code.

by the property settlement was to secure the source and the means to generate support. However, such property settlement is nondischargeable only to the extent actually necessary to service this function. There may be no need to hold the entire unpaid balance of the $1,000,000 Article 12 obligation nondischargeable under 11 U.S.C. § 523(a)(5), since what the parties bargained for, agreed to, and memorialized, was a $1,000,000 property settlement out of which Carol Brody would receive annual support in the amount of $100,000. We have no difficulty in holding the annual support obligation nondischargeable while holding dischargeable only so much of the $1,000,000 as may be unnecessary to generate the agreed upon support which we find to be the sum of $100,000 per year.

Unfortunately, the record is incomplete as to the extent to which this may be a necessity. If Denis Brody is able to assure payment to Carol Brody of the agreed support other than from the $1,000,000 property settlement, then the nondischargeability of that sum is not necessary. Alternately, if less than $1,000,000 is required to purchase an annual annuity of $100,000 for Carol Brody, only the cost of such annuity (less the $400,000 payment already made) would need to be held nondischargeable in order to satisfy the support requirements as outlined above. Similarly, if Denis Brody were able to post in trust or in escrow a sum (less the previously paid $400,000) to assure such payments, the need to hold the balance of the property settlement nondischargeable would no longer obtain.

Accordingly, Carol Brody shall settle a judgment declaring nondischargeable Denis Brody's obligation to pay to her as and for support the sum of $100,000 per year for life, commencing in accordance with the terms of the separation agreement, severing, continuing, and scheduling a conference preliminary to a hearing to be held to determine the extent, if any, to which the unpaid balance of the $1,000,000 should be declared nondischargeable as indispensable to constitute the sole source and means of and to assure payment of the nondischargeable support of $100,000 per year to which she is entitled. At such hearing the court will consider the willingness and ability of Denis Brody to provide, out of assets which do not constitute property of the estate out of which all of his other creditors are entitled to payment, a support payment such as the guarantee of a financially adequate entity, a sum of money in trust, a lifetime annuity, or other similar arrangement.