**In re Linda Lee Samson WHITE, Debtor.**

**Billy Joe WHITE, Plaintiff,**

v.

**Linda Lee Samson WHITE, Defendant.**

**Bankruptcy No. 3–84–01816.
Adv. No. 3–85–0281.**

United States Bankruptcy Court,
E.D. Tennessee.

Dec. 12, 1985.

James D. Culp, Jonesborough, Tenn., for plaintiff.

Michael J. O'Connor, Johnson City, Tenn., for defendant.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

A discharge in bankruptcy does not discharge an individual debtor from any debt—

> to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree, or other order of a court of record or property settlement agreement. . . .

11 U.S.C. § 523(a)(5) (Supp.1985).

In this case the former husband seeks a determination of the dischargeability of an alleged alimony debt.

### I

Prior to their divorce on August 6, 1984, the parties had been married for about nine years. Each had been previously married twice. Defendant Linda Lee White had only a high school education when she married the plaintiff. She had four children from her previous marriages, ages ranging from a baby to thirteen years. She received no child support income. Plaintiff Billy Joe White was an electronics engineer with ITT in Johnson City, Tennessee, when he married the debtor.

On January 18, 1980, plaintiff and defendant entered into an agreement which recites in essence:

The wife's children by a previous marriage are living with the parties and the husband has worked and supported the wife and her children.

The wife has returned to school to further her education, with the husband paying all the costs and in addition providing all the support and maintenance of the wife and children.

The wife has been accepted in medical school and the husband agrees to pay all of the educational cost for her medical degree and in addition will supply support and maintenance of the family.

Following these recitations the parties agree:

In return for the husband's payment of all educational costs and support of the wife and her children, the wife agrees that in the event the marriage between the parties is dissolved after her completion of medical school, the husband shall be entitled to and shall receive one-half (½) of the wife's earnings for life, such income to include either salary or income from private practice, after residency and internship.

Should the wife obtain work on a salaried basis, the husband shall receive one-half (½) of the gross amount and in the event she establishes a private practice, he shall be considered a full partner and receive one-half (½) of the net income.

Should the marriage be dissolved prior to completion of medical school by the wife, the husband shall receive a percentage of the income of the wife, not to exceed one-half (½) of the total and not to be less than one-fourth (¼) of the total, based upon the percentage of monies expended by the husband compared to the total amount of education costs.

The parties separated in or about May 1983. On June 8, 1984, they entered into an agreement amending the January 18, 1980 agreement. The amended agreement recites that the wife is presently in her last year at medical school and is contemplating serving one year's residency in Johnson City. The agreement notes that the hus-

band fulfilled the terms of the previous contract and paid for much of the educational cost for his wife; further, that he has obligated himself to pay a series of notes he and his wife have signed for her educational costs. The 1980 agreement as amended essentially provides:

> The wife agrees that in the event the marriage is dissolved after her completion of medical school, the husband shall receive from the wife 15% of the wife's taxable income per year while the wife is in the military service. Upon the wife leaving the military service and after having been in private practice for one year, the husband shall receive 15% of the wife's taxable income derived from her medical practice, or $20,000 per year, whichever is greater. While the wife is in an approved residency or fellowship, the husband shall receive no payment until after her first year in private practice. The payments to the husband from the wife shall extend for a period of 18 years from the date of the first payment. If the wife should quit work of her own accord, the husband shall receive a minimum of $20,000 per year for 18 years.
>
> The wife shall be responsible for and shall pay the joint notes that the parties have executed, the proceeds of which were used for the wife's educational needs.

The amended agreement expressly provides:

> "All amounts paid to the husband under this Agreement shall be designated as alimony and subject to the tax laws pertaining thereto."

On July 20, 1984, the parties entered into an agreement reciting that a bill for separate maintenance had been filed and the parties are contemplating an absolute divorce. The parties agree that—

> A house and lot owned by the parties shall become the property of the husband, subject to the mortgage against the same.

> The household furniture, with some exceptions, shall be the property of the wife.
>
> The automobiles have already been transferred into their separate names, and each will own his or her respective automobile.
>
> The travel trailer shall become the husband's property.
>
> The agreement previously entered into by the parties concerning the educational costs of the wife is to be a part of the agreement herein and made a part of the decree, should a decree be entered.

On August 6, 1984, a final decree of divorce was entered in the Circuit Court for Washington County, Docket No. 4238, *Linda Lee White v. Billy Joe White.* The final decree of divorce entered by the court approved, confirmed, ratified, and made a part of the final decree the parties' property settlement agreement of July 20, 1984.

Mr. White is forty-nine (49) years of age. He has a high school education. In addition, for one (1) year in 1956, he attended a military electronics school where he learned to repair radios. He commenced work at ITT in 1962 as a technician earning $1.26 per hour. In 1980, when the first agreement was entered into by the parties he was working as an electronics engineer earning $21,000.00 per year. In September 1984, after the ITT group with which he was working was transferred to Raleigh, N.C., he was laid off. At that time his annual salary was $32,000.00. He drew unemployment compensation for several months and has only recently obtained part-time employment, earning $6.00 per hour, in Jackson, Tennessee.[1] He has submitted applications to several major firms —Magnavox, Chrysler, North American Phillips—for employment, but due to his lack of an engineering degree has been unsuccessful. He recently sold the house awarded to him in the divorce proceeding, paid off the two mortgages, one in the amount of some $10,000.00 incurred for living expenses and his former wife's educational expenses, realizing only $700.00 to

---

**1.** Mr. White was unemployed between September 1984 and July 1985.

$800.00 equity after repaying sums borrowed to make house payments subsequent to losing his job. He is obligated to pay $135.00 monthly to a former wife for child support.

Linda White (hereafter Dr. White) is presently thirty-eight (38) years of age. She is a medical doctor in second year residency at a hospital in Johnson City, Tennessee. Her present gross income is $20,800.00 plus Army reserve pay of $247.56 per month. She will soon enter the Naval Flight Surgeon Program where her annual salary will be $28,000.00 plus annual subsistence and housing allowances of $1,260.00 and $5,000.00 respectively. At the end of six months she will become a first lieutenant and be entitled to an additional $430.00 per month flight pay. She has a three year military commitment.

Three of Dr. White's children (ages seventeen (17), fourteen (14) and twelve (12) years) presently live with her and are dependent upon her for support. In addition, she has a son nineteen (19) years of age. She receives no support payment.

Dr. White's bankruptcy petition, filed November 19, 1984, reflects debts of $145,-616.15 and assets of $11,511.00. Her assets consist of a time share interest (one week) in a resort in Pigeon Forge, Tennessee, valued at $5,000.00, less $4,646.13 mortgage; deposits, wearing apparel, automobile, and household goods with a total value of $6,511.00. The first and second mortgages against the parties' former marital residence, paid when the property was sold, are included in her scheduled debts. Also included in Dr. White's schedules are $53,418.00 in student loans which she concedes are nondischargeable. 11 U.S.C.A. § 523(a)(8) (Supp.1985). Mr. White is a co-maker on these loans.

## II

At issue is the dischargeability of two separate obligations of Dr. White to Mr. White based on an agreement incorporated by reference in their divorce decree: (1) her agreement to pay him a portion of future income and (2) her agreement to assume sole responsibility for payment of notes they cosigned for her educational needs. These obligations are excepted from discharge if, and only if, they represent alimony, maintenance, or support 11 U.S.C.A. § 523(a)(5)(B) (1979 & Supp.1985). The issue is a matter of federal law, as opposed to state law.[2]

### A. *Payments From Future Income*

■ The parties expressed characterization of the amounts Dr. White agreed to pay Mr. White as alimony is not conclusive. This court must ascertain the actual nature of the obligation. *Dial v. Presler,* 34 B.R. 895, 897 (Bankr.M.D.Tenn.1983).

■ While numerous factors may be considered to determine whether an obligation in a divorce decree or property settlement represents alimony, maintenance, or support, as opposed to a division of the parties' property,[3] this court believes the critical factors are: (1) the intent of the court entering the divorce decree, or the parties' intent in an uncontested case; (2) the relative financial need of the parties at the time of creation of the obligation; (3) the function, purpose, and substance of the obligation; and (4) whether the debt is associated with the maintenance or support of the non-debtor spouse.

In their uncontested divorce proceeding the state court accepted, without modification, the parties' property settlement agreement, incorporating by reference their June 8, 1984 agreement. The intention of the parties with respect to the nature of the payments Dr. White agreed to make to Mr.

---

**2.** The congressional intent is explicit: "What constitutes alimony, maintenance, or support will be determined under the bankruptcy laws, not State law." H.R.Rep. No. 595, 95th Cong., 1st Sess. 364, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6320. Nonetheless, state

law certainly may be considered. See *Long v. Calhoun,* 715 F.2d 1103, 1107 (6th Cir.1983).

**3.** See *In re Coffman,* Bankr.L.Rep. (CCH) ¶ 70,-741 (Bankr.D.Md.1985) and *Benz v. Nelson,* 16 B.R. 658, 660–61 (Bankr.M.D.Tenn.1981), *rev'd in part,* 20 B.R. 1008 (M.D.Tenn.1982).

White from her future income is conflicting. Mr. White testified the parties contemplated he would further his own education and that Dr. White would assist him after she had completed medical school. He further testified that a purpose of the parties' postnuptial agreements was to support him somewhat, enabling him to further his education yet maintain an accustomed standard of living and provide his own children with braces and funds for their education.[4] However, Mr. White conceded that his agreements with Dr. White also represent an effort to guarantee his investment in her career would be repaid, enhancing his prospective estate for the benefit of his own children. Also, Mr. White testified the payments to him were described as alimony in the June 8, 1984 agreement at Dr. White's request, so she could claim an income tax deduction. Dr. White denied she intended to provide support for Mr. White. She testified she merely intended to repay him in consideration of the money and time he had invested in supporting her children and herself.[5]

When this obligation was created Dr. White's financial need exceeded Mr. White's. His 1984 salary of $32,000.00 annually exceeded her income by approximately $10,000.00; she had three dependent children and had assumed sole liability for repayment of student loans totaling $53,418.00. But her potential earning power was, and remains, much greater than Mr. White's.[6]

The court is persuaded that a dual purpose underlies Dr. White's agreement to pay a portion of her future earnings to Mr. White. Clearly, the primary purpose was to repay Mr. White for his substantial investment of money and time. During their marriage Dr. White commenced post-secondary studies, graduating from both college and medical school. Almost all of her expenses and those of her children were paid either from Mr. White's salary or loan proceeds which he is jointly liable to repay.[7] Another purpose, though, was to provide Mr. White with support to enable him to secure an associate degree in engineering. While it is not apparent whether the parties contemplated Mr. White would continue full-time employment at ITT while pursuing a degree, it seems unlikely given his age. Further, Mr. White may not have been able to schedule classes permitting his continued employment with ITT. Hence, it appears that some payment to him by Dr. White would have been necessary to support his educational pursuit.

Mr. White's change in circumstances—loss of job, unemployment for ten (10) months, and relocation to secure employment where his income is only twenty-eight (28) percent of his former salary—is not a factor in fixing the portion of payments from Dr. White's future income representing alimony or support as of August 6, 1984, the entry date of the parties' divorce decree. See *Boyle v. Donovan*, 724 F.2d 681, 683 (8th Cir.1984) (bankruptcy court does not examine parties' present situation when determining whether obligation constitutes alimony). Generally, modification of an alimony or support obligation due to a change in circumstances is a matter for the state court which entered the divorce decree. Tenn.Code Ann. § 36–5–101(a)(1) (Supp.1985). *But cf. Long v. Calhoun*, 715

---

**4.** Mr. White has three children from his previous marriages. Only one of them was a minor when he and Dr. White were divorced.

**5.** Dr. White shared an apartment with friends while in medical school so she could study without interruption by her children. She paid her share of the apartment expenses from loan proceeds. It is unclear whether she maintained the apartment throughout the entire time she was a medical student.

**6.** Indeed, one year after their divorce Dr. White's income was more than two and one-half (2½) times greater than Mr. White's. Although this fact is due to the closing of the ITT plant where Mr. White formerly worked, irrefragably, Dr. White can anticipate substantial increases in her income; without further formal education Mr. White may struggle simply to secure employment.

**7.** Dr. White received a small amount of income from the United States Army beginning in 1981. She also assisted her father some, very little according to Mr. White, on income tax work during tax season.

F.2d 1103, 1110 n. 11 (6th Cir.1983) (bankruptcy court may consider debtor's current ability to pay insofar as it relates to continuing obligation where the debtor's circumstances have changed since assuming liability for joint marital debts).

Tenn.Code Ann. § 36–5–101(d) (Supp. 1985), enacts:

(d) It is the intent of the general assembly that a spouse who is economically disadvantaged relative to the other spouse be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient.... In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve his or her earning capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age, and physical and mental condition of each party;

(5) The extent to which it would be undesirable for a party to seek employment outside the home because he or she will be custodian of a minor child of the marriage;

(6) The separate assets of each party, both real and personal, tangible and intangible;

(7) The provisions made with regard to marital property as defined in § 36–4–121;

(8) The standard of living of the parties established during the marriage;

(9) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(10) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(11) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

At the time of their divorce Mr. White was economically disadvantaged vis-a-vis Dr. White only insofar as expected income in future years. Although Dr. White's needs and obligations exceeded Mr. White's, her potential relative earning capacity was much greater. His income, however, did exceed hers by approximately $10,000.00 at the time of their divorce. Neither party had significant financial resources when they were divorced. Obviously, Dr. White has a relatively superior education, furthered throughout the duration of her nine-year marriage to Mr. White. Though now necessary, further education for Mr. White to enhance his earning capacity to a reasonable level was not necessary at the time of the divorce. While both parties appear to be in sound mental and physical condition, Dr. White is eleven years younger than Mr. White, whose working career may span another fifteen (15) years or so. Neither party is precluded from working outside the home due to the needs of minor children. Dr. White received the lesser portion of the marital property; but, it does not appear there was substantial equity in the assets Mr. White received. Though there is no testimony in the record, the parties'

standard of living during their marriage was probably average, considering Mr. White's income. Undeniably, Mr. White has made a very substantial contribution, tangible and intangible, to the education and increased earning power of Dr. White.

■ Significantly, pursuant to the parties' property settlement agreement incorporating by reference their agreement of June 8, 1984, Mr. White agreed to accept fifteen (15) percent of Dr. White's taxable income while she was in the military service. Upon Dr. White's separation from the military there would be a hiatus in payments to Mr. White for the period of completion of her residency training (about two years). Additionally, no payments would be made to Mr. White during the first year of Dr. White's private practice. Presumably, at the time of the divorce, Mr. White, then 48 or 49 years old, expected to commence his own educational pursuits as soon as possible. Accordingly, Mr. White must have believed the percentage payment from Dr. White's military income plus his earned income would provide sufficient support to enable him to further his education. Considering this fact in conjunction with the relevant state statutory factors, as of the date of their divorce decree, the only portion of Dr. White's obligation to make payments to Mr. White from future income constituting alimony or support, and hence nondischargeable, was her obligation to pay fifteen (15) percent of her taxable income while in military service.

## B. *Assumption of Educational Loan Obligations*

■ While Dr. White concedes her student loan debts are nondischargeable, the question remains whether her obligation to Mr. White to hold him harmless is dischargeable.[8] In *Long v. Calhoun*, 715

F.2d 1103 (6th Cir.1983) the court established a three-step analysis to determine whether a debtor's prepetition assumption of a joint loan obligation in connection with a divorce settlement is nondischargeable because it is in the nature of alimony, maintenance or support. The initial inquiry is whether the state court or the parties intended to create an obligation providing support through the assumption of joint debts. If not, the obligation is dischargeable. However, if assumption of the joint debts was intended to provide support the bankruptcy court must then determine whether the assumption "has the *effect* of providing the support *necessary* to ensure that the daily needs of the former spouse and any children of the marriage are satisfied." *Id.* at 1109. If the loan assumption is not necessary to provide support the hold harmless obligation is dischargeable. However, if the loan assumption does provide necessary support, the bankruptcy court must "finally determine that the amount of support represented by the assumption is not so excessive that it is manifestly unreasonable under traditional concepts of support. Such an excessive allowance is at odds with the fresh start concept underlying federal bankruptcy law." *Calhoun*, 715 F.2d at 1110.

■ Because the parties did not intend to create an obligation in the nature of alimony, maintenance or support through Dr. White's assumption of the educational loan debts, it is unnecessary to inquire beyond the first step. Mr. White testified that one purpose of the parties' original agreement, entitling him to one-half (½) of Dr. White's future income in the event of divorce after her completion of medical school, was to protect him from exposure on loans he could not pay himself.[9] Under their amended agreement of June 8, 1984, Mr. White agreed to accept a smaller per-

---

**8.** This court declines to follow *Proctor v. Proctor,* 42 B.R. 537 (Bankr.E.D.Mo.1984) (not necessary to decide whether debtor husband's hold harmless obligation to former wife is dischargeable where the underlying student loan obligation to the joint creditor is nondischargeable).

**9.** The dischargeability of Mr. White's indebtedness for these loans is subject to challenge in the event he files bankruptcy. But see *Boylen v. First Nat'l Bank,* 29 B.R. 924 (Bankr.N.D.Ohio 1984) (§ 523(a)(8) does not apply to nonstudent comaker), *followed, Washington v. Virginia State Educ. Assistance Auth.,* 41 B.R. 211 (Bankr.E.D.Va.1984).

centage of Dr. White's future income, or a minimum of $20,000.00, after she has been in private practice for one year, and Dr. White agreed to assume sole responsibility for payment of her educational loans. The amended agreement embodies the parties' intent that Dr. White should repay the educational loans; her assumption is an indemnification agreement, not an obligation to provide support. When Dr. White assumed the liability for the educational loan debts her income was significantly less than Mr. White's; also, her needs were relatively greater. The only alimony or support award intended by the parties (to enable Mr. White to further his education) is included in the payments from Dr. White's future income. Mr. White did not relinquish any right to alimony or support in exchange for Dr. White's assumption of the educational loan debts. Indeed, only a portion of the reduced payment he agreed to accept represents alimony or support.

In summary, Dr. White's obligation to hold Mr. White harmless on notes they cosigned for educational loans is dischargeable; her obligation to make payments to him from her future income is nondischargeable only to the extent of fifteen (15) percent of her taxable income, for a period not to exceed three years, while she is in military service.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.