In re Peter Trent SMITH, Debtor.

Bonnie L. SMITH, Plaintiff,

v.

Peter T. SMITH, Defendant.

Bankruptcy No. 90–09470.
Adv. No. 90–9085.

United States Bankruptcy Court,
E.D. Michigan, N.D.

Sept. 30, 1991.

Robert J. Dunn, Bay City, Mich., for plaintiff.

Randall L. Frank, Bay City, Mich., for defendant.

## MEMORANDUM OPINION REGARDING DISCHARGEABILITY OF SPOUSAL OBLIGATION

ARTHUR J. SPECTOR, Bankruptcy Judge.

This is an action by the Defendant's ex-wife for a determination that the debt owed to her, which was memorialized in their divorce judgment, is non-dischargeable in bankruptcy. The Court has jurisdiction to decide this core-matter adversary proceeding pursuant to 28 U.S.C. §§ 1334(a), 157(b)(2)(I). This matter has been tried, and a judgment of no cause of action will now enter based on the following findings of fact and conclusions of law as required by F.R.Bankr.P. 7052.

Peter and Bonnie Smith were married in July, 1980. Their only child, Sarah, was born in 1985. In 1987, the Defendant filed a complaint for divorce. On April 15, 1988,

the 18th Judicial Circuit Court, the late John X. Theiler presiding, entered a final judgment of divorce upon consent of the parties and without a trial. The judgment contained the usual provisions for child custody (awarded to the Plaintiff) and child support payments (to be made by the Defendant). In addition, the judgment required the Defendant to provide for Sarah's college education and to name Sarah as the beneficiary of a $50,000 insurance policy on his life.

The terms of the divorce judgment which are most relevant to the issue here read in pertinent part as follows:

### ALIMONY

IT IS HEREBY ORDERED AND ADJUDGED that neither party shall be entitled to alimony, the Court being of the opinion that both parties are well, able-bodied and capable of gainful employment.

. . . . .

### PROPERTY SETTLEMENT AND PROVISION IN LIEU OF DOWER

. . . . .

IT IS HEREBY FURTHER ORDERED AND ADJUDGED that ... PETER T. SMITH, shall pay to ... BONNIE L. SMITH, the sum of Twenty–Five Thousand ($25,000.00) Dollars. The first Five Thousand ($5,000.00) Dollars of this amount shall be paid ... by July 1, 1992, and the sum of Twenty Thousand ($20,-000.00) Dollars shall be paid by July 1, 1994. Any sums owing after the date of July 1, 1993, shall bear interest at seven percent (7%) per annum.

The judgment was signed by both parties and their respective attorneys.

■ The Plaintiff argues that this $25,-000 indebtedness is not dischargeable because it is an obligation to a former spouse "for alimony to, maintenance for, or support of such spouse ... in connection with a ... divorce decree."[1] 11 U.S.C. § 523(a)(5). Although contrary to the express terms of the parties' divorce judgment, such an argument is apparently contemplated, if not encouraged, by language in § 523 which, in effect, states that a liability designated as alimony, maintenance, or support is nonetheless dischargeable in bankruptcy if it is not "actually in the nature of alimony, maintenance or support."[2] 11 U.S.C. § 523(a)(5)(B).

Section 523(a)(5) therefore obliges me to determine whether the parties' judgment of divorce includes true alimony, maintenance or support which would be nondischargeable in bankruptcy. In making this determination, I am directed to look at several factors. The formula established in *Long v. Calhoun (In re Calhoun)*, 715 F.2d 1103 (6th Cir.1983) is summarized as follows:

(a) whether the *intent* of the state court or the parties was to create a support obligation;

(b) whether the [alleged] support provision has the actual *effect* of providing necessary support;

(c) whether the amount of support is so excessive as to be *unreasonable* under traditional concepts of support; and

(d) if the amount of support is unreasonable, how much of it should be characterized as nondischargeable for purposes of federal bankruptcy law.

*In re Singer*, 787 F.2d 1033, 1036 (6th Cir.1986) (Guy, J. concurring; emphasis in

---

1. The expert witnesses in matrimonial law called by the parties agreed that alimony is in essence spousal support under Michigan law. *See also, e.g., Postema v. Postema*, 189 Mich.App. 89, 98, 471 N.W.2d 912 (1991). According to these witnesses, there is no provision under Michigan law for "maintenance" payments, as such, to a former spouse.

2. Applying the *"expressio unio est exclusio alterius"* principle, the Defendant argued in his motion for summary judgment that this statutory language authorizes (or requires) an inquiry

into the "true nature" of an alleged alimony obligation *only* if the obligation is characterized as alimony. I rejected this interpretation of § 523(a)(5), noting that the Sixth Circuit has called for a determination regarding the substance of a payment obligation even where, as here, the obligation is not characterized in the divorce judgment as alimony, maintenance or support. *See In re Troup*, 730 F.2d 464, 466 (6th Cir.1984); *see also In re Jackson*, 102 B.R. 524, 530, 21 C.B.C.2d 695 (Bankr.M.D.La.1989).

original).[3] The Plaintiff bears the burden of proving that the indebtedness is nondischargeable. *Calhoun,* 715 F.2d at 1111 n. 15.

## INTENT

As noted, § 523(a)(5) calls for a determination as to whether the liability in question is *"actually* in the nature of alimony, maintenance or support." (emphasis added). In this context, the term "actual" means "existing in fact or reality." Webster's Ninth New Collegiate Dictionary (1985). An argument could therefore be made that the court should focus on the *effect* of the obligation (*Calhoun's* second factor), and disregard what the parties and/or state court "intended." *Cf. In re Gianakas,* 112 B.R. 737, 742 (D.Pa.), *aff'd,* 917 F.2d 759 (3d Cir.1990) (suggesting that intent is a more important consideration when, as in *Calhoun,* a hold-harmless obligation is at issue, and stating that "the proper inquiry for the bankruptcy court is not to determine the intent of the parties but to determine the nature" of the alleged support provision).[4]

■ The arguments notwithstanding, the question of intent is not only relevant under *Calhoun,* it constitutes a "threshold" criterion. 715 F.2d at 1109. If "the state court or the parties to the divorce ... did not [intend to create an obligation to provide support], the inquiry ends there." *Id.*

■ Since *Calhoun* speaks in terms of the intention of the *parties*—in the plural—it would seem that the intention to provide support must be mutual. *See In re Helm,* 48 B.R. 215, 221, 12 B.C.D. 1199, 12 C.B.C.2d 1060 (Bankr.W.D.Ky.1985). This interpretation of *Calhoun* is corroborated by a subsequent unpublished decision of the Sixth Circuit, in which the court implicitly accepted the appellant's argument that *Calhoun* required the court to find that both parties intended the payment at issue to be a form of support. *Larson v. Boroff,* 892 F.2d 1043 (6th Cir.1990). I therefore conclude that *Calhoun's* intent requirement is not satisfied unless it is demonstrated that the divorce court or *both* parties intended to establish an obligation in the nature of support.

As noted by the court in *Helm, supra,* an obvious problem with emphasizing intent is that, at the time the divorce is granted, the parties to the divorce action are generally ignorant of, and/or indifferent to, the labels attached to the obligations imposed by the judgment. *See also Buccino v. Buccino,* 580 A.2d 13, 18, 397 Pa.Super. 241 (Pa.Super.Ct.1990); *In re Cunningham,* 125 B.R. 563, 564, 21 B.C.D. 861 (Bankr. W.D.Mo.1991) (referring to "the usual recitations of now remembered intent as best suits present desires"). But the court is frequently confronted with problems of this nature, such as when it must supply missing contractual provisions or otherwise determine the "intent" of contracting parties. And by now divorce attorneys ought to be cognizant of *Calhoun* and its significance in negotiating the terms of a divorce settlement, a factor which—at least in theory—should make the parties' intentions more readily discernible. Moreover, the inquiry into intent is greatly facilitated by reviewing objective evidence regarding the parties' intentions. *See Singer,* 787 F.2d at 1035 (the intent to provide support may be "presumed[d], ... when circumstances indicate that the recipient spouse needs support").[5]

---

**3.** Since parts c and d are interrelated, I believe the test in *Calhoun* is more appropriately characterized as comprising three, rather than four, separate steps. *See In re Moralez,* 128 B.R. 526, 528 (Bankr.E.D.Mich.1991) (Rhodes, J.); *In re Alford,* 95 B.R. 493, 494, 18 B.C.D. 1421 (Bankr. N.D.Ohio 1988); *In re White,* 55 B.R. 878, 884 (Bankr.E.D.Tenn.1985). For purposes of this opinion, then, I will collapse *Calhoun's* last two factors under the single heading of "reasonableness." *See infra* p. 970.

**4.** This point may be largely academic since, as a practical matter, the question of intent will often turn on the *effect of the alleged support obligation. See infra* n. 5 and accompanying text.

**5.** Indeed, the actual need for support will generally be the only reliable evidence of an intent to provide support. *See, e.g., In re Benich,* 811 F.2d 943, 945 (5th Cir.1987) (affirming the bankruptcy court's finding of an intent to provide support based in part on the recipient spouse's bleak employment prospects, notwithstanding

■ In this regard, *Calhoun* cited the following objective factors as relevant to the determination of the parties' intent:

> [T]he nature of the obligations assumed (provision of daily necessities indicates support); the structure and language of the parties' agreement or the court's decree; whether other lump sum or periodic payments were also provided; length of the marriage; the existence of children from the marriage; relative earning powers of the parties; age, health and work skills of the parties; the adequacy of support absent the debt assumption; and evidence of negotiation or other understandings as to the intended purpose of the assumption.

*Calhoun*, 715 F.2d at 1108 n. 7. Overall, these factors do not support the Plaintiff.

The nature of the obligation assumed: The Defendant undertook to pay the Plaintiff a fixed dollar amount—$25,000—in two future installments, the first coming due more than four years post-judgment and the second maturing more than six years post-judgment. The timing of these payments suggests that they were not intended to function as a form of support for the Plaintiff.

The structure and language of the stipulated divorce judgment: The divorce judgment was traditionally structured with a section for alimony and a separate section for property. The award in question was placed squarely in the property section of the judgment. The language of the judgment clearly expresses the intent not to provide for alimony and contains an express finding and stipulation that "both parties are well, able-bodied and capable of gainful employment."

Since the judgment was entered by consent of the parties, it of course also serves as strong evidence that not only the court, but the parties themselves intended to preclude alimony payments. *See Griffith v. Comm'r*, 749 F.2d 11, 13 (6th Cir.1984) ("The language and structure of the [di-

vorce] decree are of great weight in determining whether the decree was intended to require payments as support or property settlement. [Citation omitted]. This is particularly true when the decree is the result of a settlement agreement drafted by the parties."); *In re Ferebee*, 129 B.R. 71, 75 (Bankr.E.D.Va.1991) ("[C]haracterizations used by the parties in a post-nuptial agreement are highly probative of the parties' mutual intent...."); *cf. Green v. Comm'r*, 855 F.2d 289, 294–295 (6th Cir. 1988) ("[W]here, as here, the state court's labeling [of an award in a divorce judgment as 'marital property'] appears to be reasonable and consistent with state law, the Tax Court should accept the label and adjudicate the tax consequences stemming from the award accordingly."). Moreover, the structure and language do not appear to have been manipulated to achieve a particular result.

Lump sums/periodic payments: I find no other lump sum or periodic payment in the judgment, although, frankly, I am unsure which way this finding is supposed to cut.

The length of the marriage: I presume that this factor presupposes a direct relationship between length of marriage and likelihood of alimony. If that is so, the marriage was not of sufficient duration to raise an inference of the need for alimony, especially since the parties actually separated about a year before the divorce judgment finally entered.

The existence of children: The parties' only child, Sarah, was about two and one-half years old when the divorce judgment became final. Support for Sarah was expressly provided in the appropriate paragraphs of the judgment.

Relative earning powers of the parties: This factor is tricky. Both parties had achieved their educational goals by the time of the divorce. At that time, the Plaintiff was employed as a medical technician and the Defendant was unemployed. In fact, the Plaintiff had been the family's

---

the debtor's uncontradicted testimony that he "never intended ... to pay alimony or support"). And since the determination of whether alleged support payments are in fact necessary

for support is in essence an inquiry into effect, the issue of intent tends to subsume *Calhoun*'s second test regarding the effect of the provision in question.

primary breadwinner up to then. However, the Defendant had a medical degree and skills which provided him with significantly greater income-earning potential than the Plaintiff possessed. Because the Defendant's ability to parlay his skills into a high income was questionable (see two paragraphs below), some discount for this uncertainty must be factored into the equation. The evidence does not allow me to quantify that discount, so it is not possible to say which party had the greater earning "power" at the time of the divorce. It is clear, however, that the Plaintiff's actual earnings at that time were far greater than the Defendant's.[6]

Age, health and work skills of the parties: Both parties appeared at trial to be in their early 30's, and so I estimate that they were in their late 20's or early 30's when they divorced. No evidence of the parties' work skills was offered. The Plaintiff appeared healthy at trial and no proofs were submitted to impeach Judge Theiler's finding (and the parties' stipulation) that she was healthy at the time of the divorce.

The Defendant, on the other hand, appeared to have some kind of nervous condition which evidently affected at least his speech. This condition was well-known to the parties during the negotiation stage of the divorce proceeding. R. Earl Selby, the attorney who represented the Plaintiff during the divorce negotiations, candidly testified that he did not evaluate the worth of the Defendant's medical degree because of the Defendant's physical condition:

Q: Was any attempt made to appraise [the medical degree]?

A: No....

Q: Were you aware of any way to do it?

A: Oh, sure, sure. However, there was a problem in Mr. Smith's case as to why I was reluctant to do that.

Q: And what is that?

A: Well, because it's not enough that there just be a medical degree, there has to be some reasonable expectation that the degree is going to be put to use to generate income, either then, right at that time, or at some point in time in the future.

Q: What contributed to those questions in your mind?

A: Well, the fact that Mr. Smith was not employed, as to my knowledge had not been assigned a residence or internship.... My client made me aware of a neurological health condition that Mr. Smith suffers from. I had some questions about that as to whether or not that would impact his abilities as a doctor or as a user of this medical degree.

Selby Dep.Trans. p. 16, line 19 through p. 17, line 20. Given these doubts at the time the judgment entered, it appears that this factor favors the Defendant.

Adequacy of support without the award: At the time of the judgment, only the Plaintiff was employed and she was supporting herself. In fact, her earnings had supported not only her daughter and herself, but were sufficient to allow her to contribute to her husband's support while he studied in the Caribbean (and even after he returned and could not find employment at home). This factor therefore seems to weigh in favor of the Defendant.

Evidence of negotiation: The Plaintiff testified that she agreed to the divorce settlement without an express provision for alimony because the settlement included the $25,000 obligation. She said that her plan was to use the money as a down payment for a home in a better neighborhood. In support of her contention that this obligation was intended to constitute a form of support, the Plaintiff produced Exhibit A, a letter dated October 7, 1987, to her then attorney, Mr. James Kent, which reads as follows:

Dear Mr. Kent,

In my divorce, I'm not really all that interested in getting alimony. But Peter told me before this all started to go for everything I can get. I am capable of making a living. So alimony really isn't

---

**6.** In fact, the Plaintiff conceded during the trial of this action that she was still earning more than the Defendant ($28,000 per year versus $26,000 per year). Moreover, she has accumulated savings since her divorce and recently purchased a new car.

an important issue to me. But fight for it.

What is important to me is my daughter's future and her enviorment [sic] in which she grows in. It is important to me that my daughter recieves [sic] the best of everything because that is what she would of [sic] had if Peter & I stayed together as a family unit. She'd have the best schooling through college, a nice house in a quiet neighorhood [sic] with her own safe back yard to play in, the clothes, the toys, everything. Even a nice means of transportation.

What I am saying is I'll settle for less in alimony, but I *want* a house, a new car and my daughters [sic] education to be paid for. I am capable of making a living yes, but I will not be able to afford a house for her, a new car for which she could ride in or her college education. I believe Sarah sould [sic] not suffer any emotional pains by not having the best.

Peter verbally told me he wants to take care of Sarah and me too, well he can start by providing us with an enviorment [sic] which is comfortable for us to live.

Sincerely,

Bonnie Smith

There are some obvious problems with this letter from the Plaintiff's standpoint. In it she states that she is "capable of making a living," and that she is not "all that interested in getting alimony." The letter therefore greatly undermines the Plaintiff's claim that the $25,000 was in fact alimony.[7]

■ But the letter also indicates that the Plaintiff's primary objective was to obtain sufficient funds to maintain a certain standard of living for her daughter and that, at least from the Plaintiff's perspective, the $25,000 cash settlement was designed to achieve that objective. This suggests that the $25,000 constituted a form of child support.[8]

The Plaintiff's position is also corroborated by the testimony of Mr. Selby, who replaced Mr. Kent as the Plaintiff's attorney in the divorce proceeding. In his trial deposition, Mr. Selby concurred with the Plaintiff's testimony that she was concerned that her daughter be raised in a custom befitting the daughter of a doctor. Selby Dep.Trans. p. 12, lines 16–19; p. 20, lines 12–14 (The Plaintiff intended the payment to provide Sarah with an "elevated lifestyle."). On the basis of this evidence, and notwithstanding that most of the other *Calhoun* factors suggest otherwise, I conclude that the Plaintiff intended a portion, but not all,[9] of the $25,000 obligation to be a form of support for her child.

The Plaintiff cannot prevail in this action, however, merely by proving that she sought the payment as a means of supporting Sarah. Under *Calhoun*, the Plaintiff must demonstrate that the Defendant likewise intended the $25,000 payment to serve as a form of support. For the reasons which follow, I conclude that the Plaintiff

---

7. Even the Plaintiff's own divorce attorney was at best equivocal on the issue of whether the $25,000 was alimony. *See* Selby Dep.Trans. p. 24, line 23 through p. 25, line 16; p. 26, line 22 through p. 27, line 4; p. 32, lines 18–21.

8. Pursuant to § 523(a)(5), obligations in the nature of child support are, like alimony, nondischargeable. Although the complaint alleged only that the $25,000 payment provision constituted a form of alimony, the Plaintiff's brief in opposition to the Defendant's motion for summary judgment included an allegation that the payment was to support Sarah. Moreover, the Defendant did not object to the introduction of Exhibit A or other evidence indicating that the lump sum payment was intended to support Sarah. In accordance with Fed.R.Civ.P. 15(b), incorporated into F.R.Bankr.P. 7015, then, I regard the issue of whether the $25,000 amounted to child support as having been raised in the pleadings. *See Zappia v. B & O R. R.*, 312 F.2d 62, 64 (6th Cir.1963) (a party's failure to object may constitute implied consent to try issues not addressed in the pleadings).

9. Mr. Selby himself stated that the $25,000 payment provision reflected not only child support but reimbursement for expenses incurred by the Plaintiff while the Defendant attended medical school. *See* Selby Dep.Trans. p. 27, line 14 through p. 28, line 1; p. 32, lines 12–17. Thus, the testimony of the Plaintiff's own divorce counsel contradicts any contention that the payment was exclusively designed for Sarah's support.

failed to satisfy her burden of proof with respect to this issue.

As previously noted, *supra* pp. 963–64, the consent judgment itself is strong evidence that the Defendant had no intention of paying alimony. Most of the other factors cited in *Calhoun* also militate in the Defendant's favor on the question of his intent.

The Defendant denied that the $25,000 was intended to constitute a support payment. He testified that he agreed to pay the Plaintiff $25,000 because his lawyer recommended it and because he wanted the divorce ended. He felt he owed the Plaintiff something because she helped to support him while he was away at medical school in the Caribbean.

James Wood, an attorney who has represented thousands of divorcing parties in his 40 years of practice in Bay County, represented the Defendant in the divorce. It was his view that the $25,000 payment was not intended to be alimony. In his opinion, the Plaintiff would not have been awarded alimony after a full trial before Judge Theiler. In his extensive experience—he claimed to have had over a thousand cases before Judge Theiler over the years—and based on the facts of the case, Mr. Wood believed that Judge Theiler simply would not have awarded alimony to the Plaintiff.[10] Mr. Wood stated that his client's intention was to finalize the divorce through an award of a finite sum as a property settlement so that the divorce could not subsequently be reopened for the purpose of determining whether alimony was appropriate at some future date.[11]

Rather than presenting direct contrary evidence regarding the Defendant's intentions, the Plaintiff argued that, at the time of the divorce, the parties had virtually no property to divide. That being the case, the Plaintiff argued, the $25,000 could not have constituted a property settlement and, by default, must therefore have been a form of support. In response to this argument, the Defendant contended that his medical degree constituted a marital asset, and that the $25,000 represented a fair division of the value of this asset.

■ An assumption underlying the Plaintiff's argument is that an obligation which does not represent a property settlement is necessarily alimony or other support. Some bankruptcy court decisions lend credence to this proposition by speaking in terms of a property settlement/support dichotomy. *See, e.g., In re Messnick,* 104 B.R. 89, 92 (Bankr.E.D.Wis.1989); *In re Delaine,* 56 B.R. 460, 466 (Bankr. N.D.Ala.1985). But I believe that such a classification scheme has no independent significance under § 523(a)(5). *See In re Hill,* 26 B.R. 156, 159 (Bankr.S.D.Ohio 1983) ("While the parties have cast the argument before us, and it is common in these controversies to do so, as whether certain property ... was awarded as alimony or as property settlement, such a characterization is not particularly constructive."); *In re Brody,* 120 B.R. 696, 699, 21 B.C.D. 17 (Bankr.E.D.N.Y.1990) ("Subparagraph (B) of § 523(a)(5) recognizes that matrimonial courts and bankruptcy courts do not necessarily speak the same language."). *But see In re Jenkins,* 94 B.R.

---

10. Mr. Selby concurred on this point. In his opinion, the Plaintiff "was not in a strong position [to litigate for spousal support.] So I don't think she would have prevailed in that." Selby Dep. Trans. p. 34, lines 12–13. One reason for this skepticism was Judge Theiler himself, who Mr. Selby described as having "the reputation of being the judge least likely to grant alimony and to get into questions of future earning capacity and if you will intangible property." *Id.* p. 50, lines 15–18.

11. If the Defendant agreed to pay the $25,000 as a means of precluding subsequent attempts by the Plaintiff to obtain alimony, it could be argued that the payment provision did in fact

serve as a form of alimony. *Cf. Troup,* 730 F.2d at 466 (affirming the bankruptcy court's conclusion that a hold-harmless obligation constituted support since the dependent spouse "reduced her request for child support payments ... in consideration of" the hold-harmless provision); *In re Deatherage,* 55 B.R. 268, 272 (Bankr. E.D.Tenn.1985) (an obligation may be intended to provide support if the dependent spouse "relinquish[ed] ... rights to support in reliance on the performance of the obligation"). The Plaintiff did not raise this argument, however, and in any event I believe that any such inference arising from Mr. Wood's testimony is outweighed by the contrary evidence.

355, 357–58 (Bankr.E.D.Pa.1988) (pointing out that, in enacting the Bankruptcy Reform Act of 1978, Congress rejected a recommendation by the Commission on the Bankruptcy Laws of the United States that Congress "end the distinction [between alimony and property settlements] and thereby make alimony, support, maintenance *and* property settlement obligations nondischargeable" (emphasis in original)).[12]

Pursuant to this section, the court must declare nondischargeable any obligation which in substance is designed to support the former spouse or children of the debtor. In Michigan, one factor in determining the appropriate distribution of marital property is the needs of each spouse and the couple's children. *See, e.g., Spooner v. Spooner,* 175 Mich.App. 169, 172, 437 N.W.2d 346 (1989); *Ackerman v. Ackerman,* 163 Mich.App. 796, 808, 414 N.W.2d 919 (1987); *Vaclav v. Vaclav,* 96 Mich.App. 584, 592, 293 N.W.2d 613 (1980); *Schilleman v. Schilleman,* 61 Mich.App. 446, 450, 232 N.W.2d 737 (1975); *Ross v. Ross,* 24 Mich.App. 19, 28, 179 N.W.2d 703 (1970). Thus an obligation imposed under the terms of a divorce judgment as part of an overall property settlement may very well be in the nature of support. *See Rogner v. Rogner,* 179 Mich.App. 326, 329, 445 N.W.2d 232 (1989) (In fashioning property settlements, "the court may utilize any property in the real and personal estate of either party to achieve suitable support for the family.");[13] *see also Brody,* 120 B.R. at 699–700 ("The $1,000,000 agreed upon ... certainly manifests the indicia of a

property settlement. On the other hand, without [this] lump sum there would be no way for Carol Brody to enjoy the standard of support envisioned by the agreement. Is the ... obligation therefore a dischargeable property settlement or a nondischargeable [support] liability ...?"); *In re Cacolici,* 108 B.R. 578, 584 (Bankr.N.D.Ohio 1989) ("These obligations constitute a property settlement in the nature of ... support and are non-dischargeable...."); *Hill,* 26 B.R. at 159 ("The [Ohio] statute ... appears to distinguish division of property from alimony. The two terms are not, however, mutually exclusive.").

Conversely, and more to the point here, an obligation which is not in the nature of a property settlement is not necessarily support. A clear example of such a case is provided by *In re Rose,* 934 F.2d 901 (7th Cir.1991), where the debtor had stolen money from her then husband and was ordered to repay the funds by the state court granting the divorce. The type of obligation at issue in *Rose* vividly demonstrates that, contrary to an apparently widely held assumption, the entire universe of obligations which might be incurred in connection with a divorce judgment cannot adequately be classified as constituting either property settlement or support.[14]

The Michigan Court of Appeals confronted this problem in the case of *Postema v. Postema,* 189 Mich.App. 89, 471 N.W.2d 912 (1991). That case determined that the defendant's law degree "was clearly the end product of a concerted family effort

---

**12.** Congress may soon revisit this issue. H.R. 1242, the "Property Settlement Integrity Act of 1991," would amend § 523(a) to make nondischargeable those debts for liabilities under property settlement agreements connected with a separation agreement or divorce decree.

**13.** Indeed, a Michigan divorce statute relating to alimony and the division of marital assets explicitly recognizes that the provision of support is a legitimate objective in determining property settlements. *See* Mich.Comp.Laws § 552.23 ("[I]f the estate and effects awarded to either party are insufficient for ... support, ... the court may further award to either party the part of the real and personal estate of either party ... as the court considers just and reasonable...."). Apparently, Michigan is not the

only jurisdiction in which property settlements may serve a support function. *See Buccino v. Buccino,* 580 A.2d 13, 19, 397 Pa.Super. 241 (1990) ("[I]t has been observed that property division often achieves the same goal as alimony, i.e., support, and that the current trend is to favor greater allocations of property in lieu of long-term alimony awards."); *In re Jenkins,* 94 B.R. 355, 358 (Bankr.E.D.Pa.1988).

**14.** A more fundamental problem with the support/property settlement dichotomy is its incoherence. The concept of alimony or other support relates to a desired objective or effect. The division of marital property, on the other hand, is simply a method by which support or some other objective is realized.

giving rise to an equitable claim for compensation in favor of plaintiff in recognition of her unrewarded sacrifices, efforts and contributions toward attainment of the degree." 189 Mich.App. at 97, 471 N.W.2d 912.[15] The court framed the next issue as whether the law degree was "a marital asset subject to property division," or if it was instead "more properly considered as a factor in awarding alimony." *Id.* at 97–98, 471 N.W.2d 912.

Although conceding that a degree "cannot be characterized as 'property' in the classic sense," *id.* at 100, 471 N.W.2d 912, *Postema* nevertheless concluded that the law degree was a marital asset. *Id.* at 101, 471 N.W.2d 912. By refusing to hold that that which is not (at least traditionally) in the nature of a property settlement is necessarily alimony, *Postema* implicitly recognized the deficiency in the premise advanced by the Plaintiff in this case.[16]

Because there is no basis under federal bankruptcy law for concluding that an obligation which is not a property settlement must necessarily be for support, nor is such a conclusion mandated by common sense, the Plaintiff's argument in this regard would seem to be misguided. But notwithstanding *Postema*'s apparent difficulty with the bimodal property settlement/support analytical framework, that case does support the proposition that obligations imposed by a divorce judgment are by definition either support or a property settlement under Michigan law (despite the obvious overlap between the two classifications). Whether the Defendant viewed the payment provision as a property settlement may therefore have some bearing on the question of whether he intended the provision to provide for support. *Cf. Singer,* 787 F.2d at 1038 (Guy, J., concurring) ("The state alimony law is not the only source of evidence for a factual determination of intent to create support, but it is a legitimate one.").

■ The Plaintiff's claim that the parties had no property to divide is based on her contention that the Defendant's medical degree is not "property" under Michigan divorce law. However, this contention is inaccurate. At the time the parties obtained their divorce, there was (and still is) a split of authority in Michigan on the question of whether an advanced degree constitutes a marital asset subject to property distribution. *See Postema,* 189 Mich.App. at 97–98, 471 N.W.2d 912 (collecting cases). Thus, even if it is true that thè couple had no assets other than the Defendant's medical degree, the judgment's characterization of the payment as a property settlement was entirely appropriate according to one line of authority in Michigan.

The Plaintiff also stressed the fact that no formal attempt was made to value the degree, as might be expected of marital assets subject to distribution upon divorce. But as already discussed in a different context, *supra* p. 964, the Plaintiff's divorce attorney explained that the degree was not appraised because of the Defendant's health problems.[17] And it is entirely possible that the Defendant's decision not to push for an appraisal of the degree (assuming the degree-holding spouse is ever inclined to do so) was simply based on his own determination that he would likely have ended up paying more than $25,000 as a result of the appraisal. *See* Selby Dep.

---

**15.** The objective in recognizing such a claim, according to *Postema,* should be "to financially *return to* the nonstudent spouse what that spouse contributed toward attainment of the degree, [rather than reimbursing] the nonstudent spouse for 'loss of expectations' over what the degree might potentially have produced." 189 Mich.App. at 103–04, 471 N.W.2d 912.

**16.** *Postema* hinted at the futility of inquiring into whether a divorce-related obligation constitutes a property settlement, opining that "whether or not an advanced degree can physically or metaphysically be defined as 'property' is beside the point." 189 Mich.App. at 100, 471 N.W.2d 912 (quoting *Woodworth v. Woodworth,* 126 Mich.App. 258, 263, 337 N.W.2d 332 (1983)).

**17.** The Plaintiff's desire to bring the divorce to a speedy resolution may have been another reason that the Plaintiff chose to forego a formal evaluation of the degree. *See* Selby Dep.Trans. p. 41, line 20 through p. 42, line 2 ("Mrs. Smith wanted this settled. She was already living outside of the Bay City area.... Stability is very important and stability can be derived from resolution. And she wanted this resolved.").

Trans. p. 53, lines 16–19 ("... I think the reason that there was a virtual capitulation to the [$25,000] is that Mr. Smith felt he was getting a good deal.").

The decision not to appraise the degree therefore appears to have been motivated by practical considerations, rather than reflecting a conclusion as to, or assumption regarding, the legal nature of the degree. Accordingly, I find that the Plaintiff failed to establish that the Defendant regarded the payment provision to be anything other than a property settlement.

To summarize, the evidence established that the Plaintiff intended some (unspecified) portion of the $25,000 payment to provide better living conditions for her child. On the other hand, to the extent the Defendant had any particular intent with respect to the nature of the $25,000 payment, it was to compensate the Plaintiff for supporting the family while he was in medical school. From the Defendant's perspective, then, it appears that the obligation in effect constituted a recognition of the Plaintiff's equitable claim against him. *Cf. Postema, supra.*

Based on the foregoing, I conclude that the Plaintiff failed to demonstrate that the Defendant intended the $25,000 payment to be a form of alimony or other support. Because the Plaintiff has not established this "threshold" criterion, I need not address the other factors cited in *Calhoun,* 715 F.2d at 1109. In order to establish a fuller record in the event of an appeal, however, I will consider these other factors as well.

### EFFECT

The second factor in *Calhoun* is whether the provision in question has the "effect" of providing necessary support. 715 F.2d at 1109. Before determining this issue, however, I must address a more fundamental question: what is meant by "necessary support"? Fortunately, *Calhoun* provides an answer to this question.

After holding that the issue of whether a divorce-created obligation constitutes support is governed by "federal bankruptcy law," 715 F.2d at 1107, and that traditional notions of support must be tempered by the countervailing "fresh-start" principle applicable in bankruptcy, *id.* at 1109, the Sixth Circuit made the following statements regarding the kind of support contemplated under § 523(a)(5):

> [The bankruptcy court] must ... inquire whether such assumption [i.e., the debtor's assumption of the couple's joint debts] has the *effect* of providing the support *necessary* to ensure that the daily needs of the former spouse and any children of the marriage are satisfied.... The bankruptcy court should also look to the practical effect of the discharge of each loan upon the dependent spouse's ability to sustain daily needs.... If without the loan assumption the spouse could not maintain the daily necessities, such as food, housing and transportation, the effect of the loan assumption may be found "in the nature of" support for purposes of the Bankruptcy Act. *See, e.g., Inskeep v. Draper,* 25 B.R. 518, 520 (Bkrtcy.S.D.Ohio 1982); *Hixson v. Hixson,* 23 B.R. 492, 496 (Bkrtcy.S.D.Ohio 1982); *Matter of Painter,* 21 B.R. 846, 848 (Bkrtcy.M.D.Ga. 1982). If the loan assumption is not found necessary to provide such support, the inquiry ends and the debtor's obligation to hold the former spouse harmless must be discharged.

715 F.2d at 1109 (emphasis in original).

■ The foregoing comments lead me to conclude that, although state law standards of support may be relatively generous, the standard for purposes of § 523(a)(5) is restricted to the provision of what might be characterized as the "basic necessities" of life. To the extent that an obligation would provide benefits greater than basic needs such as food, housing and transportation, it must be held dischargeable.

Of course, the so-called "daily necessities" of life come with wildly different price tags, and *Calhoun* did not specify whether, for example, the kind of "transportation" to which the debtor's former spouse is entitled is a Maserati, bus fare, or something in between. I believe, however,

that the tenor of *Calhoun*, with its emphasis on the debtor's fresh start and repeated references to *necessary* support, as well as its pointed omission of any discussion regarding the level of comfort which the former spouse had expected or to which he or she had become accustomed, suggests that the court would be disinclined to deny a debtor's discharge to the extent the alleged support provision would permit the former spouse to enjoy relatively lavish "necessities." *Cf. Helm*, 48 B.R. at 224 ("While it is true that the living standards of the parties should be taken generally into account in maintenance questions, we do not believe it to be the business of the bankruptcy court to force the perpetuation of an artificially grand life style.").

This observation is reinforced by a review of the caselaw cited in *Calhoun*. In *Inskeep*, the court apparently endorsed the notion that, for purposes of § 523(a)(5), support entails the maintenance of "the *barest* necessities of life, such as food and shelter." 25 B.R. at 520. (Emphasis added). The court went on to conclude that the "contemplated transfer" of a six year old Chevrolet automobile was not in the nature of support, as "[t]here is no evidence that the vehicle is necessary for Plaintiff's use in her support." *Id.*

The court held in *Painter* that a divorce court's award of attorney's fees constituted alimony because "[n]ot being forced to spend her meager resources for attorney's fees enabled Ms. Painter to provide food, shelter and clothing for herself and her infant daughter." 21 B.R. at 848.

An even starker notion of support is found in *Hixson*, where the court concluded that the "debts for [a] new leach bed and [a] garden tractor battery" were dischargeable. 23 B.R. at 496. Quoting *In re Newman*, 15 B.R. 67, 69 (Bankr.M.D.Fla. 1981), *Hixson* stated that "[t]he public policy behind [§ 523(a)(5)] is clear and is based on the proposition that the former spouse *rather than society* should be responsible for the maintenance and support of members of the family unit which is destroyed

through divorce." *Id.* (Emphasis added). If, as *Hixson* suggests, the objective of § 523(a)(5) is to prevent the debtor from shifting his or her burden of support to the taxpayers, then that section presumably contemplates support at a level sufficient to obviate the dependent spouse's need for public assistance.

The clear gist of these cases is that a debtor's former spouse can obtain a determination of nondischargeability under § 523(a)(5) only to the extent minimally sufficient to meet his or her basic needs. In citing them, *Calhoun* apparently endorsed this premise.

For purposes of § 523(a)(5), then, I conclude that the term "support" entails only the provision of life's basic necessities at a relatively modest cost. This formulation is hardly definitive, of course, inasmuch as one person's idea of living "modestly" may strike other people (the debtor, for example) as obscenely wasteful. But since *Calhoun* did not provide more specific criteria, the Sixth Circuit apparently opted to leave the bankruptcy courts with fairly wide discretion in determining, on a case-by-case basis, at what point a "necessity" becomes an extravagance. *Calhoun* did provide the courts with a useful guideline in assessing the necessity of alleged support payments, however, and it is with reference to this guideline that I will review the evidence as it bears on this issue.

The Plaintiff submitted no evidence showing that the payment provision *functioned as a form of support without which she would be unable to provide herself and Sarah with the basic necessities.* To the contrary, the Plaintiff conceded that the $25,000 was designed to provide her daughter with the kind of lifestyle befitting a doctor's daughter, from which I infer a level of support substantially higher than that envisioned by *Calhoun*.[18] Accordingly, I conclude that the payment provision did not have the effect of providing necessary support under *Calhoun*. Allowing for the possibility of reversal on appeal regarding the meaning of "support" under

---

**18.** This point is brought home emphatically by Plaintiff's Exhibit A, *supra* pp. 964–65, a letter in which she repeatedly states her desire to obtain "the best" for Sarah.

§ 523(a)(5), however, I will nevertheless review the evidence before me on the question of whether the amount of alleged support at issue here was unreasonable under *Calhoun.*

## REASONABLENESS

If the court finds that the provision in question was intended to provide support and in fact functions as a form of necessary support, the next inquiry under *Calhoun* is whether the amount of support is "manifestly unreasonable." 715 F.2d at 1110. According to *Calhoun,* this issue is to be decided based upon "traditional concepts of support." *Id.* Unfortunately, however, it is not clear what *Calhoun* meant by this term.

At a minimum, the inquiry into the reasonableness of a support payment is to include a determination as to whether the obligation "substantially exceeded a spouse's present and foreseeable ability to pay." 715 F.2d at 1110. *Calhoun* arguably implies that the debtor's financial wherewithal is the only relevant consideration, inasmuch as the court states that "[t]he inquiry will be limited to whether the amount agreed to is manifestly unreasonable in view of the earning power and financial status of the debtor spouse." *Id.*

But it is difficult to understand why *Calhoun* would speak in broad terms about "traditional concepts of support," if that phrase were meant to refer simply to the debtor's ability to pay. More importantly, the conclusion that the issue of reasonableness is limited to a consideration of the debtor's financial means is seemingly contradicted by *Calhoun's* instruction that the court is to

> set a reasonable limit on the nondischargeability of [the support] obligation ... [using] factors similar to those a state court would employ to formulate a reasonable limit on support.... [T]he bankruptcy courts should consider such traditional state law factors as the relative earning powers of the parties, their

financial status, prior work experiences or abilities, other means of support and other facts relevant to the *substance of the result* achieved by the [support obligation] in order to determine how much ... can be fairly considered "in the nature of" support for purposes of federal bankruptcy.

*Id.* (emphasis in original).[19] The foregoing passage would seem to suggest that the issue of reasonableness should include numerous factors in addition to the debtor's income potential.

The problem with this conclusion, however, is that these additional factors should logically have already been taken into consideration at the second level of the *Calhoun* analysis. For example, the non-debtor spouse's earning ability and his or her "other means of support" are clearly pertinent to the question of whether the alleged support provision is in fact necessary. *Cf. Singer,* 787 F.2d at 1035 (citing *Shaver v. Shaver,* 736 F.2d 1314 (9th Cir.1984) for the proposition that "such circumstances as the presence of minor children [and an] imbalance in the relative incomes of the parties" are relevant to a determination as to whether "the recipient spouse needs support").

 In order to avoid this apparent redundancy, *Calhoun* must be interpreted in one of three ways: (1) *Calhoun* did not intend for the bankruptcy court to determine at the second level of analysis whether, and to what extent, the alleged support payments are in fact necessary; (2) *Calhoun* did intend for the court to make such a determination at that level, but also requires a second determination at the third level using essentially the same factors but viewed from the perspective of a hypothetical "state court after an adversarial proceeding," 715 F.2d at 1110 n. 12; or (3) *Calhoun* intended the court to determine at the second level whether the payments provide necessary support, with the inquiry at the third level being limited to whether

---

**19.** This reference to factors used by state courts is made in the context of reducing an excessive support provision to a reasonable amount. Presumably, however, these same factors would be relevant in determining whether the amount of support is excessive in the first instance.

the debtor can afford to make such payments.

The problem with alternative number one, of course, is that it would effectively rewrite *Calhoun* so as to nullify the court's emphasis on support which is *necessary*. And since it would be impossible to determine whether a payment provision has the effect of providing support without first defining what is meant by "support," reading out of *Calhoun* the court's description as to what constitutes "necessary support" would leave the bankruptcy court with no clue as to how to conduct the second level of inquiry. I therefore reject this interpretation of *Calhoun*.

The second alternative poses an obvious theoretical problem: if the court has already made a finding that the support payment provides nothing more than the basic necessities of life, it is difficult to understand how this amount—which by definition is minimally adequate to provide for daily needs—can be subject to further reduction based on vaguely described state law principles. It is not readily apparent why a state court would hold that, for reasons unrelated to the ability to pay support, the right to support is limited to some amount *less* than is required to provide for the basic necessities. And even if that were the law in some jurisdictions, *Calhoun* does not suggest, nor does there appear to be any justification for, adopting such a standard for purposes of § 523(a)(5). Because I do not believe that *Calhoun* intended to imply that a spouse's right to support could be decreased to a level below that which is sufficient to maintain the basic necessities (other than in recognition of the debtor's inability to pay such support), I likewise reject this second alternative.

The third alternative is problematic because it essentially ignores the language in *Calhoun* regarding the relevancy of state court factors at the third level of analysis. But it is consistent with *Calhoun's* statement, already noted, to the effect that the inquiry at that level is limited to a review of the debtor's financial status. 715 F.2d at 1110. More importantly, interpreting *Calhoun* in this manner leads to the most coherent result: among the third-level factors cited by *Calhoun*, the only logical grounds for discharging all or a portion of an obligation to provide necessary support would be the debtor's limited ability to pay. I therefore conclude that *Calhoun* did not intend to suggest that the bankruptcy court is to examine effect at the second level without reference to whether the support is necessary, nor did *Calhoun* intend to suggest that affordable support payments could be both necessary and "manifestly unreasonable."

In determining whether the $25,000 payment provision was manifestly unreasonable, then, I believe that the only issue under *Calhoun* is whether the debtor could afford to pay it.[20] The Plaintiff presented little evidence regarding the Defendant's financial status either at the time of the divorce or thereafter.[21] The Defendant now earns $26,000 annually, however, and this amount is likely to increase substantially after he completes his psychiatric residency. Since the amounts of the payments at issue are relatively small and do not mature for some time, I hold that the payment provision is within the Defendant's means, and thus is not "manifestly unreasonable" under *Calhoun*.

To summarize, I hold as follows:

(1) The Plaintiff intended a portion of the $25,000 payment to function as a form of support for her daughter, but the kind of support which she contemplated is not "necessary" as that term is used in *Calhoun*, and thus did not have the effect of

---

20. Although not explicitly limiting *Calhoun's* reasonableness test to the issue of affordability, it appears that other courts have done so as a matter of practice. *See, e.g., In re Solomito,* 112 B.R. 25, 26–27 (Bankr.S.D.Ohio 1990); *In re Terrell,* 114 B.R. 907, 915 (Bankr.W.D.Ky.1989).

21. *Calhoun* leaves open the possibility that changes in the debtor's financial status subsequent to the divorce may be relevant in determining whether the support obligation is reasonable. 715 F.2d at 1110 n. 11; *see also In re Singer,* 787 F.2d 1033, 1038 (6th Cir.1986) (Guy, J., concurring).

providing "support" for purposes of § 523(a)(5);

(2) Even if the kind of support contemplated by the Plaintiff is within the scope of § 523(a)(5)'s exception to discharge, the Plaintiff failed to establish that the state court or the Defendant intended the payment in question to operate as support of any kind;

(3) If the $25,000 payment was intended by both parties to function as support within the meaning of § 523(a)(5), the Plaintiff did establish that the amount and terms of the payment are reasonable under the circumstances.

For the reasons stated, a judgment for the Defendant shall enter declaring that the $25,000 obligation contained in the parties' judgment of divorce was discharged when the Defendant received his bankruptcy discharge on September 5, 1990.